No. 24-12236

IN THE UNITED STATES COURT OF APPEALS FOR
THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

SHANE HAMPTON,
*Defendant/Appellant.*

On Appeal from the United States District Court for Southern District
of Florida
Case Number 23-cr-20172

APPELLANT'S BRIEF

Freddy Funes
TOTH FUNES PA
25 Southeast Second Avenue
Suite 805
Miami, Florida 33131
(305) 717-7851

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellant, Shane Hampton, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1:

1.    Argentieri, Nicole M.

2.    Armstrong, Scott

3.    Becerra, Hon. Jacqueline

4.    Berke, Daryl

5.    Charest-Turken, Gabrielle Raemy

6.    Damian, Hon. Melissa

7.    Funes, Freddy

8.    Goodman, Hon. Jonathan

9.    Hampton, Shane

10.   Jaco, James Andres

11.   Kane, Michael

12.   Llanes, Barbara R.

13.   McDonald, Ian

14.   Miller, Lisa H.

15.   Morales, Eric E.

16.    Norkin, Walter

17.    Otazo-Reyes, Hon. Alicia M.

18.    Reboso, Manolo

19.    Reid, Lisette Hon.

20.    Sanchez, Hon. Eduardo

21.    Sanders, Jeremy R.

22.    Seitz, Hon. Patricia A.

23.    Sundy, Christopher

24.    Torres, Hon. Edwin G.

25.    Taylor, Mark

26.    Toossi, Amir

27.    Walsh, Daniel R.

28.    Williams, Hon. Kathleen

29.    Wolvaardt, George

TOTH FUNES PA

s/ Freddy Funes
Freddy Funes
Ingraham Building
25 Southeast Second Avenue
Suite 805
Miami, Florida 33131
ffunes@tothfunes.com
(305) 717-7851

STATEMENT REGARDING ORAL ARGUMENT

Because this appeal concerns an issues of first impression in this Circuit, including whether a cryto token constitutes an investment under *SEC v. J. Howey Co.*, 328 U.S. 293 (1946), Appellant, Shane Hampton, requests oral argument.

TABLE OF CONTENTS

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE ...............................................................4

   I.   STATEMENT OF THE FACTS...................................................4

      A.   The Indictment Contained Four Counts Against Hampton. ....4

      B.   The Trial Contained a Paucity of Evidence that Hampton Knew Moonwalkers Was Wash Trading or Spoof Ordering. ............6

         i.   Kane was CEO of Hydrogen Technology, and Hampton's boss.............................................................................................6

         ii.   Chorlian created HYDRO tokens after several Hydrogen Technology employees decided to create it...................................8

         iii.   Hampton looked for a market maker, and Moonwalker goaded Hydrogen Technology into hiring it. ...............................11

         iv.   Ostern was deceitful to Hampton and removed Hampton from e-mails. ...............................................................................16

         v.   The Government relied heavily on a Slack channel communication among Kane, Chorlian, Ostern, Wolvaardt, and Hampton. ..............................................................................19

         vi.   During the conspiracy, Chorlian made $400,000 from HYDRO; Hampton made $0 from HYDRO. ...............................23

   II.   COURSE OF PROCEEDINGS ...........................................................25

      A.   The District Court Excludes Testimony Explaining Blockchain Technology...................................................................25

      B.   The Case Goes to Trial............................................................26

      C.   The District Court Enhances Hampton's Sentence.................29

   III.   STANDARDS OF REVIEW..............................................................30

SUMMARY OF THE ARGUMENTS ....................................................... 32

ARGUMENT AND CITATION TO AUTHORITY ................................... 35

I.    THE CONVICTION ON COUNT 1 SHOULD BE OVERTURNED BECAUSE HYDRO WAS NOT A SECURITY AND IT WOULD VIOLATE DUE PROCESS TO ENFORCE A VIOLATION OF 15 U.S.C. § 78i CRIMINALLY. ......................... 35

A.    Even Taking the Facts in the Light Most Favorable to the Government, HYDRO Was Not a Security. .................................... 35

i.    There was little evidence of a common enterprise. .............. 38

ii.    There was no evidence of any reasonable expectation of profits derived from others' efforts. ............................................ 39

B.    Given the Due Process Clause, a Jury Should Not Have Determined Whether HYDRO Constitutes a Security ................... 43

II.    THE CONVICTIONS ON COUNTS 1 AND 2 MUST BE OVERTURNED BECAUSE THERE WAS INSUFFICIENT EVIDENCE OF ANY AGREEMENT TO CONSPIRE BY HAMPTON. ........................................................................ 46

III.    A NEW TRIAL IS REQUIRED BECAUSE OF THE DISTRICT COURT'S EVIDENTIARY AND JURY INSTRUCTION ERRORS. ..................................... 48

A.    The District Court Erred in Not Allowing Hampton To Instruct the Jury on His Theory of Defense. ................................... 48

B.    The District Court's Jury Instructions on Count 1 Misstated the *Howey* Test. ............................................................................. 50

C.    The District Court's Evidentiary Determinations Cumulatively Prejudiced Hampton To Have an Unfair Trial. .............................. 52

IV.    ALTERNATIVELY, THE CASE SHOULD BE REMANDED FOR RESENTENCING. ................................................................................. 55

A.    The District Court Erred in Finding a Loss of Over $1 Million Under § 2B1.1 of the Sentencing Guidelines .................................. 55

iii

i.     Hydrogen Technology's gain should not have been used as a proxy for loss. ..............................................................................55

ii.    Hydrogen Technology's gain was largely speculation. ..........56

B.   The District Court Plainly Erred in Applying the Sophisticated Means Enhancement...................................................................57

CONCLUSION ..................................................................................59

CERTIFICATE OF COMPLIANCE......................................................60

# TABLE OF AUTHORITIES

CASELAW

*Bonner v. City of Prichard*,
    661 F.2d 1206 (11th Cir. 1981) (en banc)……………………….....49

*Chicago v. Morales*,
    527 U.S. 41 (1999)……………………………………………44

*Dunn v. United States*,
    442 U.S. 100 (1979)……………………………………………44

*Eberhardt v. Waters*,
    901 F.2d 1578 (11th Cir. 1990)………………………………...38, 51

*Fedance v. Harris*,
    1 F.4th 1278 (11th Cir. 2021)…………………………………….39

*Gall v. United States*,
    552 U.S. 38 (2007)…………………………………………….....55

*Molina-Martinez v. United States*,
    578 U.S. 189 (2016)…………………………………………...59

*Ruefenacht v. O'Halloran*,
    737 F.2d 320 (3d Cir. 1984)…………………………………….....44

*Rosales-Mireles v. United States*,
    585 U.S. 129 (2018)……………………………………....……59

*SEC v. C.M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943)…………………………………………...42

*SEC v. Merchant Cap., LLC*,
    483 F.3d 747 (11th Cir. 2007)…………………………………44, 51

*SEC v. Mut. Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005)..............................................43

*\*SEC v. Ripple Labs, Inc.*,
    682 F. Supp. 3d 308 (S.D.N.Y. 2023)...............................40–43

*SEC v. Unique Fin. Concepts, Inc.*,
    196 F.3d 1195 (11th Cir. 1999).............................37–39, 51

*\*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946).........................................37–38

*\*United Housing Found., Inc. v. Forman*,
    421 U.S. 837 (1975)....................................40, 43, 51

*United States v. Bankston*,
    945 F.3d 1316 (11th Cir. 2019).................................58

*United States v. Beckles*,
    565 F.3d 832 (11th Cir. 2009)..................................58

*United States v. Bradley*,
    644 F.3d 1213 (11th Cir. 2011)............................55–56

*United States v. Cross*,
    928 F.2d 1030 (11th Cir. 1991).................................54

*United States v. Doge*,
    597 F.3d 1347 (11th Cir. 2010).................................31

*United States v. Eckhardt*,
    466 F.3d 938 (11th Cir. 2006)..................................44

*United States v. Farris*,
    614 F.2d 634 (9th Cir. 1979)...................................45

*United States v. Gonzalez,*
    834 F.3d 1206 (11th Cir. 2016)...............................................46

*United States v. Gupta,*
    463 F.3d 1182 (11th Cir. 2006)...............................................57

*United States v. Horn,*
    129 F.4th 1275 (11th Cir. 2025).........................................56–57

*United States v. Isnadin,*
    742 F.3d 1278 (11th Cir. 2014)...............................................30

*United States v. Lanier,*
    520 U.S. 259 (1997).............................................................44

*United States v. Maxwell,*
    579 F.3d 1282 (11th Cir. 2009).........................................30, 47

*United States v. Minuse,*
    142 F.2d 388 (2d Cir. 1944)...................................................45

*United States v. Moran,*
    778 F.3d 942 (11th Cir. 2015)................................................46

*United States v. Opadahl,*
    930 F.2d 1530 (11th Cir. 1991)..............................................49

*United States v. Robertson,*
    493 F.3d 1322 (11th Cir. 2007)...............................................30

*United States v. Rothenberg,*
    610 F.3d 621 (11th Cir. 2010)................................................31

*United States v. Ruiz,*
    59 F.3d 1151 (11th Cir. 1995)................................................49

vii

*United States v. Sheffield,*
992 F.2d 1164 (11th Cir. 1993)..............................….......52–53

*United States v. Stein,*
846 F.3d 1135 (11th Cir. 2017).............................…....56–57

*United States v. Tashman,*
478 F.2d 129 (5th Cir. 1973)...................................…..49

*United States v. Todd,*
108 F.3d 1329 (11th Cir. 1997)...........................…..........53–54

*United States v. Vandergrift,*
754 F.3d 1303 (11th Cir. 2014)...............................…......57

*United States v. Verdeza,*
69 F.4th 780 (11th Cir. 2023)...............................….......31

*United States v. Wetherald,*
636 F.3d 1315 (11th Cir. 2011)...............................….........31, 39, 45, 55

*Wright v. SEC,*
112 F.2d 89 (2d Cir. 1940)..................................…....45

STATUTES AND REGULATIONS

15 U.S.C. § 78c....................................................…....37

15 U.S.C. § 78i.............................................…25, 35–37, 44–46

18 U.S.C. § 371...........................................…..5, 35

18 U.S.C. § 1349.........................................…..6, 46

U.S.S.G. § 2B1.1...........................................…..29, 55–58

OTHER AUTHORITIES

Kyle Bersani, Note, *Separating Governance Tokens from Securities: How the Utility Token May Fall Short of the Investment Contract*, 43 CARDOZO L. REV. 1305 (2022)..................................................................45

Nate Crosser, Comment, *Initial Coin Offerings as Investment Contracts: Are Blockchain Utility Tokens Securities?*, 67 U. KAN. L. REV. 379 (2018)..............................................................................45–46

Michael Mendelson, *From Initial Coin Offerings to Security Tokens: A U.S. Federal Securities Law Analysis*, 22 STAN. TECH. L. REV. 52 (2019)..................................................................................45

## STATEMENT OF JURISDICTION

The Government indicted Appellant, Shane Hampton, in the U.S. District Court for the Southern District of Florida, which had jurisdiction over the criminal case under 18 U.S.C. § 3231. On June 25, 2024, the district court entered a judgment and sentence against Hampton, and he timely appealed on July 9, 2024. Because the judgment constitutes a final order, this Court has jurisdiction under 18 U.S.C. § 1291 and Federal Rule of Appellate Procedure 4(b).

STATEMENT OF THE ISSUES

1.    Appellant was convicted of conspiring to manipulate the price of an investment contract. A thing is an investment contract if its purchaser's fortunes are interwoven with the sellers' efforts and if the purchasers had a reasonable expectation of profits from others' efforts. Here, the alleged investment contract is a utility, blockchain token, which had no value other than whatever utility coders provided to the token by developing it. No evidence was provided about whether a reasonable purchaser would expect profits from the labor of others, rather than, say, the market's speculation for crypto technology. Was there sufficient evidence to find the blockchain token a security beyond a reasonable doubt?

2.    If a criminal statute does not provide an ordinary person notice that his or her conduct is prohibited, it is void for vagueness. Whether something is an "investment contract" requires the application of a three-prong test, rendering that term "inherently vague" in the words of the Third Circuit Court of Appeals. Whether crypto tokens are investment contracts, commodities, both or something else has been debated endlessly in legal circles. Under these circumstances, is 15

U.S.C. § 78i, when applied to blockchain utility tokens, void for vagueness?

3.      Appellant was convicted for two different conspiracy charges, both of which require evidence beyond a reasonable doubt that he knowingly joined a conspiracy. No direct evidence—including the co-conspirators testimony—exists that Appellant knew there was a criminal conspiracy, and the circumstantial evidence can be read innocently. Under these circumstances, was there sufficient evidence to convict Appellant?

4.      Defendants have the right to instruct the jury on their theory of defense, so long as they meet their evidentiary burden—a burden this Court has described as extremely low. The district court denied Appellant's request to include his theory of defense in the jury instructions because he did not testify in his own defense and because the other instructions covered it. Did the district court abuse its discretion in denying Appellant's request for instructions?

5.      To determine whether something is a security, the finder of fact must consider whether the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the

investment. Instead of using this Court's language, which focuses on objective facts about expectations of profits, the district court instructed the jury to determine whether "the individual buyer depended upon the efforts of" others for profits, which focuses of the buyer's subjective intent. Did the district court abuse its discretion in providing these erroneous instructions?

6.      At trial, Appellant's defense consisted of his belief that there was nothing wrong going on. To this end, he sought to introduce expert testimony explaining how a utility token should work, conversations in which he was told lawyers had reviewed the plan to decentralize the tokens, and communications that showed Appellant's understanding that the tokens were not security. Did the district court abuse its discretion in barring this evidence, thus cumulatively rendering Appellant's trial unfair?

7.      This Court has explained that a scheme's gain should not be used as a proxy for victims' losses unless it is not feasible to calculate the victims' losses. Here, the Government did not present any reason why it could not calculate the victims' losses. Did the district court

3

abuse its discretion when it used gain as a proxy for losses when sentencing Appellant?

8.      By its plain language, a sophisticated-means enhancement applies at sentencing only if the "defendant intentionally engaged in or caused the conduct constituting sophisticated means." Though the alleged scheme was undeniably sophisticated, no evidence suggests that Appellant engaged in or caused the conduct constituting sophisticated means. Did the district court plainly err when it nevertheless applied this enhancement on Appellant?

## STATEMENT OF THE CASE

I.      STATEMENT OF THE FACTS

Appellee, the Government, indicted Appellant, as well as Michael Kane and George Wolvaardt, in the district court. [ECF No. 3]

A.      The Indictment Contained Four Counts Against Hampton.

The Indictment alleged that Kane was co-founder and the CEO of Hydrogen Technology Corporation, that Hampton was the Chief of Financial Engineering at Hydrogen, and that Wolvaardt was the Chief Technology Officer of Moonwalkers Trading Ltd. [ECF No. 3 at 2] The Indictment generally alleged that Hampton, Wolvaardt, and Kane conspired to inflate the value of Hydrogen Technology's crypto token,

called HYDRO, through wash trades and spoof orders with the help of software (called a "bot" throughout the Indictment and trial) created by Moonwalkers. Against Appellant, the Indictment alleged four counts.

In Count 1, the Indictment alleged that Hampton conspired to commit an offense against the United States in violation of 18 U.S.C. § 371. [ECF No. 3 at 4] In particular, it alleged that Kane, Wolvaardt, and two other co-conspirators, as well as Hampton, beginning around June of 2018 and through April of 2019, conspired to violate 15 U.S.C. § 78i(a)(1) (which prohibits wash trades of securities) and § 78(a)(2) (which prohibits spoof orders of securities). [ECF No. 3 at 4] The purpose of the conspiracy, the Indictment alleged, was to unlawfully enrich themselves and Hydrogen Technology by selling HYDRO at "artificially inflated prices." [ECF No. 3 at 5] The Indictment alleged that Hampton took an overt act, namely, in February of 2019, he sent an "electronic communication" to Kane informing him that there was "some value" to Hydrogen Technology's retention of Moonwalkers. [ECF No. 3 at 12]

In Count 2, the Indictment alleged that Kane, Wolvaardt, and others, along with Hampton, conspired to commit wire fraud in

violation of 18 U.S.C. § 1349. [ECF No. 3 at 12] The factual basis for this violation, the Indictment noted, was the same as for Count 1. [ECF No. 3 at 13–14] Counts 3 and 4 alleged that Hampton committed wire fraud in violation of 18 U.S.C. §§ 1343 and 2(a) by sending Bitcoin to Wolvaardt.

B.    The Trial Contained a Paucity of Evidence that Hampton Knew Moonwalkers Was Wash Trading or Spoof Ordering.

The evidence provided at trial, when viewed in the light most favorable to the Government, shows the following.

i.    Kane was CEO of Hydrogen Technology, and Hampton's boss.

Hampton worked for Hydrogen Technology's predecessor, Hedgeable as a software developer, where his co-worker Andrew Chorlian also worked. They developed "API," which is the interface that allows one application to interact, communicate, and share information with other applications.[1] [ECF No. 276 at 46:20–47:19] Hedgeable became Hydrogen Technology around 2017, and Kane was co-owner (along with his brother) of Hydrogen Technology, as well as its CEO.

---

[1] Citations to the trial transcripts cite to the transcript page number, not necessarily the ECF header page number. Citations to all other documents cite to the ECF header page number.

6

Hampton stayed on after Hedgeable became Hydrogen Technology. [ECF No. 276 at 48:19–25]

Hydrogen Technology sold API to financial institutions, like banks, and in 2017 Hampton focused on developing Hydrogen Technology's API. [ECF No. 276 at 49:1–5, 14–25]

As Chief of Financial Engineering at Hydrogen Technology, Hampton focused squarely on the API for financial institutions, because that was Hydrogen Technology's business. Hampton's obligations included coding the actual product. [ECF No. 280 at 113:9–12] Indeed, Hampton spent between 80 and 95% of his time on coding and developing the API for Hydrogen Technology—not HYDRO or blockchain.[2] [ECF No. 277 at 84:5–25] While Hydrogen Technology had about 25 employees during this time, Hampton's team of engineers consisted of only five to ten persons. [ECF No. 276 at 68:14–16, 280 at 116:13–16] Given this, Hampton had a large workload, especially on the API portion, since he was the only person who knew how the API worked. [ECF No. 280 at 117:8–15]

---

[2] The parties agreed to define blockchain as "a distributed public ledger that recorded incoming and outgoing data and crytpo . . . transactions in an unchangeable manner." [ECF No. 276 at 40:11–13]

> ii.    Chorlian created HYDRO tokens after several
>        Hydrogen Technology employees decided to create it.

Kane, his brother, and engineers and employees at Hydrogen Technology decided to create a token. [ECF No. 276 at 51:4–15] In early 2018, Chorlian, who was Hydrogen Technology's lead blockchain engineer, created 11,111,111,111 tokens for Hydrogen Technology (known as HYDRO),[3] by running a code on the Ethereum blockchain to create tokens. [4] [ECF No. 276 at 55:8–25, 58:21–22] Hydrogen Technology did not create HYDRO as part of an initial coin offering— the crytpo equivalent of an IPO. [ECF No. 277 at 27:3–12]

Instead, right after HYDRO's creation, Hydrogen Technology gifted 25 percent of the HYDRO tokens—that is, nearly 3 billion tokens—to developers through what it called an "air drop." Before gifting the HYDRO tokens, Hydrogen Technology verified, through a prolonged process, that the developers who were to receive these free tokens had experience writing code and had plans to use the tokens.

---

[3] HYDRO was the ticker symbol used for Hydrogen Technology's token.

[4] The parties also defined "Ethereum" as "a blockchain platform premised on smart contracts," and they defined "smart contracts" as "computer programs that automatically execute transactions when certain conditions are met." [ECF No. 276 at 19–23]

[ECF No. 276 at 57:8–58:1; ECF No. 277 at 30:8–14, 32:16–18, 35:20–23] This process included tracking the developers' IP addresses and preparing spreadsheets to verify that the developers were legitimate coders. Thanks to this process, Hydrogen Technology rejected nearly 5000 persons who asked for free tokens as developers. [ECF No. 277 at 36:1–37:9] Overall, 11,000 developers received free HYDRO tokens as part of Hydrogen Technology's air drop. [ECF No. 277 at 36:6–11]

Hydrogen Technology explicitly gifted its tokens to make sure HYDRO was not deemed a security. [ECF No. 277 at 27:18–24]

HYDRO tokens were not cryptocurrency—one could not simply use them to purchase goods through PayPal, for example. Instead, HYDRO tokens were meant to have utility—that is, developers or coders were to use them to develop functions and applications through coding and programming. The air drop was part of this plan by Hydrogen Technology, as was the HYDRO Community Development Project, which sought to find useful ways to incorporate HYDRO into the blockchain, and the Decentralization Ambassador Program, which sought to find members who wanted to contribute more into HYDRO. [ECF No. 277 at 39:8–40:14]

9

What's more, Hydrogen Technology provided a white paper, which explained that HYDRO would use an ERC-20 token to have Hydrogen Technology's platforms interact with the blockchain.[5] [ECF No. 133-5 at 14] The white paper went into technical detail on how the HYDRO token would work and interact with Hydrogen Technology's platform, and it provided ideas on how it could be used with financial technology, such as for authentication processes, crytpo wallets, and Know-Your-Customer compliance. [ECF No. 133-5 at 11]

Hydrogen Technology's employees too received HYDRO tokens. Hampton received 2.5% of the tokens (about 280 million tokens); Kane and his brother each received about 1.3 billion tokens. Although Hampton, Chorlian, Kane, and Kane's brother received tokens right after the tokens' creation, other Hydrogen employees eventually received HYDRO tokens too. [ECF No. 276 at 55:21–56:25; ECF No. 180 at 120:6–9]

---

[5] The parties defined ERC-20 as "the technical standard for smart contract tokens created on the Ethereum blockchain platform." [ECF No. 276 at 40:24–25]

10

   iii.  Hampton looked for a market maker, and Moonwalker goaded Hydrogen Technology into hiring it.

Developers did not create enough uses for HYDRO, so Hydrogen Technology sought other ways to disperse the tokens. [ECF No. 276 at 59:1–5] One way to do that was to disperse, or "decentralize," HYDRO tokens through exchanges. [ECF No. 277 at 66:12–24] Thus, in July of 2018, Hydrogen Technology wanted HYDRO listed on Bittrex—an online crypto exchange of esteemed reputation. The Government introduced evidence that, to get HYDRO on Bittrex, Kane (with the help of Hydrogen Technology's in-house counsel) drafted a legal memorandum for Bittrex, in which the memorandum argued that HYDRO was not a security. [ECF No. 276 at 159:2–160:21; ECF No. 278 at 11:13–19]

Although in communications with Hampton and Chorlian, Kane (who is not a lawyer) took credit for writing the legal memorandum, in other communications, Kane informed Hampton that he wrote the memorandum with two attorneys; Hampton also informed Kane that Bittrex required a legal opinion from a law firm. [ECF No. 277 at 49:25–50:14, 53:6–55:1] The Government believes Hampton knew that Kane primarily drafted the legal memorandum because Kane told Hampton

11

that the Law Offices of Kane and Kane wrote the memorandum. Yet in that same chat message Kane included an emoticon—what looks like a walrus in a monocle and top hat. [ECF No. 138-4 at 5]

Chorlian described the legal memorandum written by Kane and Hydrogen Technology's in-house counsel as dishonest. But he also agreed that the legal memorandum correctly noted that, at the time HYDRO was released, Hydrogen Technology was not using HYDRO tokens to raise capital. [ECF No. 277 at 56:8–14]

Contemporaneously, Hydrogen Technology was looking for market managers. A "market maker" is "someone who helps investors by supplying liquidity on both the buy and sell side" of a transaction. [ECF No. 278 at 9:3–4] Market makers are legitimate. [ECF No. 278 at 9:9–11]

Chorlian testified that in mid-July 2018, he, Hampton, Kane were looking for legitimate market makers. [ECF No. 277 at 67:12–22] Throughout August and September of 2018, Hampton explored 15 or so market makers, none of which were illegitimate. On September 6, 2018, Hampton told Kane and Chorlian that Hydrogen Technology should hire either "Pacific" or "HedgeTech," which Chorlian admitted were

12

both legal market makers. [ECF No. 277 at 115:19–116:5, 121:25–122:5, 123:5–11]

Moonwalkers, however, reached out to Hydrogen Technology and kept trying to get hired as Hydrogen Technology's market maker. [ECF No. 277 at 96:3–19, 112:17–19, 113:12–114:1]

Tyler Ostern (Moonwalker's president) first reached out to Kane in August of 2018. [ECF No. 278 at 9:24–25, 10:4–6] Kane, who was Hydrogen Technology's CEO and Hampton's boss, then rejected Hampton's suggestion of hiring HedgeTech and told him that Moonwalkers had reached out once again. [ECF No. 277 at 122:2–5]

There is no dispute that Moonwalkers was not a legitimate market maker. Spoof orders are orders that are placed without any intention to execute the order, while wash trades are trades in which the buyer and the seller are the same. [ECF No. 278 at 20:10–14] Both are deceitful, and Moonwalkers possessed a bot that could discharge thousands of spoof orders or wash trades in seconds. [ECF No. 278 at 9:12–20, 13:8–16, 15:8–15] In communications among themselves, Ostern and Wolvaardt (Moonwalker's CTO) admitted that Moonwalkers' bot performed wash trades and spoof orders. [ECF No.

13

278 at 8:15–24, 40:1–25] In his testimony, Ostern admitted that Moonwalkers' bot undertook wash trading, spoof trading, and other manipulative techniques to get persons to buy HYDRO. [ECF No. 278 at 14:8–22]

At Kane's direction, Hampton was supposed to take a call from Moonwalkers, but he could not do it because he was busy with other job duties, so Chorlian took the call (really, a videoconference meeting) with Moonwalkers. In that call, Moonwalkers demonstrated its bot's functionality to Chorlian, who testified that he knew after the demonstration that the bot could perform illegal actions, like wash trading. [ECF No. 277 at 85: 2–4, 100:5–23; ECF No. 278 at 48:19–21] The bot also performed legal functions. [ECF No. 277 at 100:24–101:1] And Chorlian admitted that, when he wrote to Hampton about the presentation, he did not mention anything about the bot's illegal functions. [ECF No. 277 at 101:6–12, 102:5–22, 103:12–104:18] This is proven by the e-mail from Chorlian to Hampton, sent on August 6, 2018, in which he described Moonwalkers' bot as "robust" and admitted that Moonwalkers demonstrated the bot on his call. [ECF No. 133-5 at 1]

14

Chorlian also admitted that he never verbally told Hampton about the bot's illegal functions. [ECF No. 277 at 104:25–105:5 ("Q. You never had any conversation with Shane telling him that Moonwalkers was doing illegal market making activity, correct? A. Correct."), 143:1–15] Nor did Hampton ever tell Chorlian that he had seen Moonwalkers' bot in action. [ECF No. 277 at 133:16–134:1]

While considering whether to hire Moonwalkers, Kane, Hampton, and Chorlian also had internal communications via a team-collaboration platform called Slack, which is like Microsoft Teams and lets persons communicate electronically instantaneously.

For instance, in October of 2018, Hampton stated that Hydrogen Technology wanted to provide a target liquidation quantity each month, which Chorlian interpreted as having a goal for how much HYDRO to sell each month. [ECF No. 276 at 88:7–12] Hampton also stated that Hydrogen Technology needed to distinguish between market making and getting liquidity. Kane concurred. In his testimony Chorlian explained that he took Hampton's distinction to mean that market making is an attempt to use an intermediary to make the buying and selling of tokens seamless, while liquidity is actively selling tokens to

have liquid funds. [ECF No. 276 at 84:5–85:15] Chorlian took Hampton's and Kane's communications on the issue to mean that Kane wanted to prioritize the selling of HYDRO. [ECF No. 276 at 85:3–7]

  iv.  Ostern was deceitful to Hampton and removed Hampton from e-mails.

While no one disputes that Moonwalkers' bot could undertake spoof orders and wash trades, the evidence shows that Ostern was dishonest to Hampton. For instance, in an e-mail dated September 27, 2018 (i.e., after Ostern spoke with Chorlian), Ostern lied to Hampton, telling him that Moonwalkers was providing services to other clients. [ECF No. 278 at 51:7–9]

Nor is there any concrete evidence that Ostern spoke with Hampton about Moonwalker's illegal activities. For example, in a conversation in which Ostern and Hampton hashed out the terms of Moonwalker's services, all Hampton told Ostern was that Hydrogen Technology wanted to sell HYDRO in a way that the HYDRO's value was preserved. [ECF No. 278 at 53:6–25]

To be sure, in vacillating testimony, Ostern first testified that he demonstrated the bot to Hampton on the call. Next, he stated that he at a minimum explained what the bot could do to Hampton. Later, he said

16

that he showed the bot to the Hydrogen Technology team but could not recount which individuals. That testimony morphed to him not being 100% sure who at Hydrogen Technology he showed the bot. And, finally, he was no longer sure if he even described the bot's features to Hampton, saying that he believed he did. Ostern even reached out to an FBI agent and asked if his testimony was okay, thereby disobeying the district court's order not to speak with anyone while he was still technically under oath. [ECF No. 278 at 54:3–14, 79:11–80:18; ECF No. 279 at 43:17–19] As noted, there is direct evidence that Chorlian viewed Moonwalkers' bot, while other than Ostern's confused testimony there is no evidence whatsoever that Hampton ever saw the bot.

Hydrogen Technology finally hired Moonwalkers in October of 2018. [ECF No. 277 at 96:1–2] Hampton ultimately signed an agreement with Moonwalkers on behalf of Hydrogen Technology, and in exchanging the signed agreement Ostern mentioned in an email that Moonwalkers might "obfuscate the fact" that Hydrogen Technology was offloading HYDRO. [ECF No. 278 at 93:13–23] Hampton signed the services agreement on October 4, 2018, and the agreement sets out Moonwalkers' responsibilities:

17

- "provide market making services to The Hydrogen Technology Corporation";

- "sell a portion of the teams token; devaluing the price of the coin as little as possible";

- "execute these services on both CoinEx and Bittrex Exchanges via the trading accounts provided by the Hydrogen Technology Corporation"; and

- "handle a supply of 5BTC given to them by the Hydrogen Technology Corporation which will be used for Services."

[ECF No. 133-31 at 1] In return, Hydrogen Technology paid Moonwalkers $9000 per month for its services. The agreement nowhere mentions any market manipulation, spoof orders, or wash trading. [ECF No. 133-31 at 1–2]

At around the same time, Ostern removed Hampton from key communications. For instance, on October 8, 2018, Ostern, Wolvaardt, Hampton, Kane, and Chorlian were on an e-mail chain discussing Hydrogen Technology's Bittrex account information. Then, on October 11, 2018, Ostern removed all participants from the chain other than Kane and wrote that Moonwalkers would have "plenty of excuses to pump price and sell into the FOMO guys down the road." [ECF No. 133-13 at 1]

18

Something similar occurred in an e-mail chain from around the same time, where ultimately the e-mail chain was whittled down to Ostern and Kane, with Ostern explicitly informing Kane that Moonwalker was "playing both sides to get the price to move upward." [ECF No. 279 at 112:22–113:8; ECF No. 133-11]

> v.    The Government relied heavily on a Slack channel communication among Kane, Chorlian, Ostern, Wolvaardt, and Hampton.

After hiring Moonwalkers, Kane created a "channel" among Hampton, Chorlian, Ostern, Wolvaardt, and himself on Slack. [ECF No. 276 at 81:25–82:2, 97: 13–23] Throughout the trial, the Government pointed to communications in the channel to underscore Hampton's knowledge of the conspiracy.

For instance, in this Slack channel, it pointed to a message from Ostern in which he shows a jpeg of the "candle tool" and writes "[j]ust to show you guys what the candle tool can do." [ECF No. 276 at 110:15–25] Hampton did not respond to this message from Ostern, and Ostern recognized that there is nothing unusual about seeing a candle, which can be legitimate graphs. [ECF No. 279 at 58:5–7]

19

On the same day, Ostern sent other messages, stating that Moonwalkers was going to "incite a fire sale to shake the weak hands" to get the sell walls to move down.[6] [ECF No. 276 at 119:10–24] Chorlian took this message to mean that Moonwalkers wanted to have token holders who are willing to sell quickly to sell so only purchasers interested in holding to HYDRO long term remained. [ECF No. 276 at 119:10–24] Hampton did respond, after Ostern asked for a telephone call, with Hampton saying that he was not around but could talk the next day. [ECF No. 276 at 121:24–125:2]

On October 26, 2018, Ostern sent another message, this time mentioning "volume shennanigans," which Chorlian interpreted as wash trading. [ECF No. 137-1 at 15] That same day, Ostern wrote that it "took about 3 seconds for bot to generate about a million" and that half of that was fake. [ECF No. 276 at 123:3–5, 126:23–127:5] Hampton did not respond to these statements, and no evidence states that he saw them.

---

[6] Chorlian testified that "sell walls" generally meant a large block of tokens listed for sale "kind of all the same price." [ECF No. 276 at 120:4–5]

20

On October 29, 2018, Ostern wrote again, writing that Moonwalkers wanted to "nuke" sell walls, and Hampton responded that Hydrogen Technology did not "get involved in any talks involving trading on" its "social media." [ECF No. 276 at 130:6–12, 131:18–24]

On November 7, 2018, Ostern mentions "faux buy walls," and Kane asked Moonwalkers to refrain from going on Hydrogen Technology's social media, because he was "concerned that members of the community will report trading irregularities" and get HYDRO "de-listed." [ECF No. 276 at 141:6–14] Kane informed Ostern that "[t]he mandate is really only to sell the tokens," and that if the price goes down, that is Hydrogen Technology's fault "for not getting new clients, partners, and developers." [ECF No. 137-1 at 27] Again Hampton did not respond to these communications, and no direct evidence dictates that he must have seen them.

On January 23, 2019, Kane stated that HYDRO had no utility at the time, and was worth nothing. [ECF No. 278 at 112:8–14; ECF No. 137-1 at 55] Nonetheless, Chorlian testified that HYDRO tokens *did* have a developed use at around this time, namely, a two-factor authentication application that required a few hundred tokens per

21

person per year. That usage was largely within Hydrogen Technology. [ECF No. 276 at 114:20–115:5]

Both Chorlian and Ostern interpreted the Slack channel messages as signifying forms of spoof ordering, wash trading, and manipulation of HYDRO's prices. There is no dispute that Moonwalkers used Hydrogen Technology's Bittrex account to create spoof orders and wash trades, though that account was really only Kane's Bittrex account under the Hydrogen Technology moniker. [ECF No. 279 at 139:21–140:11, 161:13–15] During the relevant period, Hydrogen Technology bought around 900 million HYDRO tokens from itself through Bittrex and cancelled the purchase of nearly 30 billion HYDRO tokens. [ECF No. 279 at 167:1–4, 171:18–23]

In January and February of 2019, Hampton and Kane discussed possibly renewing Moonwalkers' contract. [ECF No. 138-9 at 2] Hampton informed Kane that renewing Moonwalkers' contract may still have had "some value." [ECF No. 138-11 at 1]

The Government provided no evidence that Hampton had access to the Bittrex account or could see how many tokens Hydrogen Technology was trading.

22

      vi.      During the conspiracy, Chorlian made $400,000 from HYDRO; Hampton made $0 from HYDRO.

In April of 2019, Chorlian sold his HYDRO tokens during the term of conspiracy and netted himself more than $400,000. [ECF No. 277 at 158:7–11] And, in the aggregate, Hydrogen Technology withdrew $1,328,784 from its account at Bittrex. [ECF No. 173:15–18]

Hampton for his part, never sold HYDRO on Bittrex. [ECF No. 277 at 45:1–2; ECF No. 280 at 100:15–20; ECF No. 133-19] Eventually, nearly a year after the conspiracy period terminated, Hampton sold some HYDRO for around $70,000. [ECF No. 280 at 105:14–17]

At trial, the Government introduced the testimony of two of HYDRO's purchasers—Mark Taylor and Daryl Berke.

Taylor became interested in HYDRO in June of 2018—before Hydrogen Technology hired Moonwalkers—based on an article he read on Reddit and because HYDRO won a blockchain award. [ECF No. 277 at 169:20–24] He bought about $10,000's worth of HYDRO from an exchange other than Bitterex in the summer of 2018. [ECF No. 277 at 22–24] He noted that he bought HYDRO then because there was "speculation" that its value would go up, because it won a blockchain award, and because of Hydrogen Technology's website and Discord

23

channel. [ECF No. 277 at 171:11–19, 174:7–14][7] He bought more HYDRO in October of 2018 when it became listed on Bittrex and he saw there was a lot of trading of HYDRO. [ECF No. 277 at 172:1–6, 173:6–18] On November 30, 2018, he bought another $4000's worth of HYDRO on Bittrex. [ECF No. 277 at 179:23–180:2] And he testified that it was important that Hydrogen Technology planned on building the token into a true utility token. [ECF No. 277 at 174:19–25]

For his part, Berke testified that that he believed HYDRO was cryptocurrency (rather than just a blockchain token).[8] [ECF No. 277 at 188 at:5–6] He testified that he bought HYDRO because crypto in general was "appreciating in value pretty quickly." [ECF No. 277 at 188:17–21] He looked at Hydrogen Technology's website and its development plan before purchasing HYDRO. [ECF No. 277 at 188:21–23] Though he thought Hydrogen Technology's plan for developing

---

[7] Chorlian too testified that, because there was no meaningful way to use the token, the purchasers of tokens bought it for speculation. [ECF No. 276 at 61:9–14]

[8] The parties did not agree to a definition of cryptocurrency, but they did agree to define "Bitcoin," which is a form of cryptocurrency, as "[a] type of crytpo asset . . .genereated and controlled through computer software operating via a decentralized peer-to-peer network," which "can be used for purchase or exchanged for other cypto assets on exchanges." [ECF No. 276 at 40:14–18]

24

HYDRO was appealing, he did not purchase HYDRO to use its utility but rather to sell it for a higher price than the price he bought it. [ECF No. 277 at 189:3–18] He purchased about $2700 worth of HYDRO in November of 2018. [ECF No. 277 at 193:14–16]

The Government introduced messages from Kane on Hydrogen Technology's social media in which he tells five individuals that Hydrogen Technology is working to expand the HYDRO utility token ecosystem. [ECF No. 138-17 at 1; ECF No. 138-18 at 1; ECF No. 138-19 at 1] No evidence explains how many persons viewed Kane's messages.

II.    COURSE OF PROCEEDINGS

The Government filed the Indictment in the U.S. District Court for the Southern District of Florida in April of 2023.

A.    The District Court Excludes Testimony Explaining Blockchain Technology.

A major issue at trial was whether HYDRO was a security and thus within the scope of 15 U.S.C. § 78i(a)(1)–(2). After all, HYDRO is a crypto token, and so Hampton hired an expert to testify about blockchain, decentralized applications, smart contract platforms, the cyrpto markets, market makers, and algorithmic trading. He was also to testify on whether a reasonable person would be able to determine

25

HYDRO a security. [ECF No. 95-1] The Government moved to exclude the expert's testimony in its entirety, arguing that the expert's testimony was not relevant and did not apply any scientific, technical, or specialized expertise. [ECF No. 95]

The district court granted the Government's motion, concluding that (1) the expert's "testimony that a reasonable person would not be able to determine whether HYDRO was a security improperly creates a non-existent legal element that is irrelevant to the charged conduct and in  effect constitutes factual testimony that goes to Defendant's subjective knowledge as to the nature of HYDRO, (2) the expert did "not set out any methodology with reliable principles," and (3) the expert's testimony would not have helped the jury "understand the evidence and may" have confused it. [ECF No. 107 at 1–2]

B.    The Case Goes to Trial.

The trial in this case started on January 29, 2024. At and before the trial, the district court made critical evidentiary rulings.

First, the district court barred Mr. Hampton from introducing the entirety of the Slack communications with the alleged co-conspirators as evidence.

26

At trial, the Government's main exhibit was a 57-page screenshot of a discussion on Slack among Hampton, Kane, Chorlian, Ostern, and Wolvaardt. [ECF No. 137-1] Hampton sought to provide other portions of the Slack conversation, but the Government opposed, and the district court barred their introduction on hearsay grounds. As the Government acknowledged, the other portions went largely to Hydrogen Technology's employee's "subjective knowledge" on whether "the token was a security." [ECF No. 276 at 35:17] The Government argued that these extra messages did not fall within the rule of completeness because the Government's 57-page document was not in any way misleading, because subjective knowledge of whether the token was a security was irrelevant, and because the extra messages were hearsay from Kane. [ECF No. 276 at 34:16–20] The district court rejected Hampton's argument that the statements would go to his intent because the messages were irrelevant. [ECF No. 276:14–25] The district court also concluded that the statements were hearsay and did not meet the rule of completeness under Federal Rule of Evidence 106. [ECF No. 276 at 38:9–10]

27

Second, because the Government objected, the district court did not provide a jury instruction describing the *Howey* test as outlined in the Eleventh Circuit precedent. [ECF No. 274 at 32:1–35:22]

Third, the district court refused to provide a jury instruction based on Hampton's defense of honest belief of a mistaken fact. The district court rejected Hampton's request, asserting that because he was not testifying he had not met his burden of showing his defense; it also noted that it believed the other instructions covered the honest-belief-of-mistaken-fact instructions. [ECF No. 280 at 154:21–155:4]

Fourth, the district court barred Hampton from introducing evidence that he was told by Kane that HYDRO's decentralization plan was approved by legal counsel. Because the "legality of market makers and [Hydrogen Technology's] decentralization plan [was] uncontested," this "derivative statement," the district court held, "would not be probative to negate an intent to defraud and would confuse and distract the jury with irrelevant evidence." [ECF No. 90 at 10]

Ultimately, the jury returned a verdict of guilty on Counts 1 and 2. It returned a verdict of not guilty on Counts 3 and 4. [ECF No. 121]

C.    The District Court Enhances Hampton's Sentence.

At sentencing, the Government sought to use, under U.S. Sentencing Guidelines § 2B1.1(b)(2)(A)(i), Hydrogen Technology's gain from the alleged scheme as a proxy for victims' losses, and Hampton objected, arguing that the loss should be no more than $33,753, because that was the actual loss by victims shown. [ECF No. 156 at 9; ECF No. 195 at 17; ECF No. 270 at 14:15–16:11]

The district court rejected Hampton's objection, concluding that "gain would be the appropriate" calculation for losses. [ECF No. 270 at 18:7–21] Based on this conclusion, the district court found that the loss for § 2B1.1 purposes was $1.3 million. [ECF No. 270 at 18:12–19] Under § 2B1.1, that increased Hampton's level by 14; had the district court agreed with Hampton, his level would have been increased only by 4. *See* U.S.S.G. § 2B1.1(b)(1).

The district court also applied a two-level enhancement, without objection, for sophisticated means. [ECF No. 270 at 19:14–16]

Based on these enhancement, the district court calculated a level 21 with no criminal history, which put Hampton's sentencing range between 37 and 46 months. [ECF No. 270 at 22:1–6] The district court

29

then varied downward after considering the factors outlined in 18 U.S.C. § 3553, and sentenced Hampton to 35 months' imprisonment. [ECF No. 270 at 69:11–15]

Judgment was entered on June 27, 2024, and Hampton filed his notice of appeal on July 9, 2024. [ECF No. 199; ECF No. 206]

III.    STANDARDS OF REVIEW

The "Court reviews *de novo* whether there is sufficient evidence to support a guilty verdict in a criminal trial. In so doing, the Court views the evidence in the light most favorable to the Government and resolves all reasonable inferences and credibility evaluations in favor of the verdict." *United States v. Isnadin*, 742 F.3d 1278, 1303 (11th Cir. 2014). "Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (internal quotation marks omitted). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007).

Where a party objects to an evidentiary decision, the Court reviews evidentiary rulings for abuse of discretion, but, if a party does not object, then the plain-error standard applies. *United States v. Wetherald*, 636 F.3d 1315, 1320 (11th Cir. 2011). A district court abuses its discretion if it applies an incorrect legal standard. *United States v. Doge*, 597 F.3d 1347, 1350 (11th Cir. 2010).

"If the cumulative effect of evidentiary errors is prejudicial, the court will reverse, even if each individual error is harmless." *Wetherald*, 636 F.3d at 1320.

The Court reviews a trial court's jury instructions under a "deferential standard of review" and will reverse "only if" the review leaves it "with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Verdeza*, 69 F.4th 780, 788 (11th Cir. 2023).

Finally, "[w]ith respect to Sentencing Guidelines issues, this Court reviews 'purely legal questions *de novo* . . . ." *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010).

31

SUMMARY OF THE ARGUMENTS

The conviction on Count 1 survives only if a HYDRO token is an "investment contract" as defined by the Supreme Court's *Howey* precedent. Under *Howey*, a HYDRO token is an investment contract only (1) if there is an investment of money, (2) if a purchaser's fortunes are interwoven with the seller's, and (3) if the purchaser has a reasonable expectation of profit based on others' efforts. The Government, which provided scant evidence that HYDRO was marketed to the public or that the public bought HYDRO tokens because of a reasonable expectation of profit, rather than speculation that all crypto assets would gain market value, did not provide sufficient evidence on prongs two and three to sustain Hampton's conviction.

Regardless, the conviction on Count 1 should be overturned because § 78i is void for vagueness to the extent it incorporates the *Howey* test's definition of investment contract (which the Third Circuit has described as an "inherently vague term"). It is arbitrary and provides no fair notice to allow a jury, who listens to investors' subjective basis for purchasing, to decide whether the totality of the

32

circumstances under *Howey* make a crypto token an investment contract

This Court should also overturn Counts 1 and 2 because the Government provided insufficient evidence to conclude Hampton knowingly joined a conspiracy. The Government provided zero direct evidence that Hampton knew that what was going on was illegal. Instead, it relied on the inferences to be drawn from electronic communications. Given that no evidence showed that Hampton read all of those communications or understood the phrases being tossed around, the evidence was insufficient to find that Hampton knowingly joined a conspiracy.

The district court committed two serious jury instruction errors that require reversal. First, it prevented Hampton from instructing the jury on his theory of defense—that he mistakenly believed Moonwalkers and Kane were doing everything by the book. The district court barred jury instructions on this issue because Hampton did not meet his evidentiary burden since he was not testifying. But that burden is extremely low, and Hampton did not have to testify to meet this burden. He could have—and did—rely on inferences that could be drawn from

33

his co-conspirator's testimony and the documentary evidence introduced at trial. Second, the district court misstated the *Howey* test's second prong, using language that implied that the *Howey* test relied on a purchaser's subjective intent, rather than the objective totality of the circumstances.

Similarly, these errors plus a handful of evidentiary rulings cumulatively prejudiced Hampton and deprived him of a fair and just trial.

Finally, when determining Hampton's sentence, the district court enhanced his sentence based on the victims' loss. To calculate that loss, however, the district court used Hydrogen Technology's gain as a proxy for the victims' loss. This Court has explained that courts should not do that unless it is not feasible to show the victims' loss. Moreover, it is the Government's burden to show that loss. The Government did not meet this burden, and Hydrogen Technology's gain was largely speculative, and so the district court erred in swapping gain for loss.

Finally, the district court plainly erred when it applied a sophisticated means enhancement to Hampton's sentencing. By its plain language, that enhancement applies only where the defendant

34

(viz., Hampton) engaged in or caused sophisticated means. No evidence was presented at trial that Hampton did anything other than sign a contract, communicate electronically, and remind his boss to pay Moonwalkers.

## ARGUMENT AND CITATION TO AUTHORITY

I. THE CONVICTION ON COUNT 1 SHOULD BE OVERTURNED BECAUSE HYDRO WAS NOT A SECURITY AND IT WOULD VIOLATE DUE PROCESS TO ENFORCE A VIOLATION OF 15 U.S.C. § 78i CRIMINALLY.

The Court must overturn Hampton's conviction for violating 18 U.S.C. § 371.

A. Even Taking the Facts in the Light Most Favorable to the Government, HYDRO Was Not a Security.

Count 1 charged Hampton under 18 U.S.C. § 371, which makes it unlawful for "two or more persons to conspire . . . to commit any offense against the United States." 18 U.S.C. § 371. The offense Hampton allegedly committed against the United States was violating 15 U.S.C. § 78i(a)(1) and (2), which generally render wash trades and spoof orders regarding "securities" unlawful:

> It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

35

(1) For the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security, (A) to effect any transaction in such security which involves no change in the beneficial ownership thereof, or (B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

(2) To effect, alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

36

15 U.S.C. § 78i(a)(1)–(2). By the statute's plain language, it makes wash trading and spoof ordering unlawful with regard to "any security." *Id.*

An "investment contract" falls within the statute's definition of "security." 15 U.S.C. § 78c(a)(10). And the Supreme Court, in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), defined investment contract through a three-prong test. Because HYDRO is not an investment contract under the *Howey* test, Hampton could not have violated § 78i(a).

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." *Id.* at 298–99. "This Court has divided the *Howey* test into the three elements: (1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others." *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999) (internal quotation marks omitted). The evidence failed to show a common enterprise or expectation of profits to be derived solely from the efforts of others.

37

i.      There was little evidence of a common enterprise.

In the Eleventh Circuit, "[a] common enterprise exists where the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990) (internal quotation marks omitted). "[T]he requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter]." *Unique*, 196 F.3d at 1199 (alteration in original). "The thrust of the common enterprise test is that the investor have no desire to perform the chores necessary for a return and are attracted to the investment solely by the prospects of a return." *Eberhardt*, 901 F.2d at 1580. The evidence, however, shows that HYDRO was a utility token, not cryptocurrency, stock, or some other investment in Hydrogen Technology that would rise in price as Hydrogen Technology succeeded.

As the white paper and Chorlian explained, HYDRO was a token meant to be developed—in other words, used—in order to create functioning apps. Hydrogen Technology provided tokens to over 11,000 developers with the hopes that its protocols would be used to create

38

products. And in October of 2018, HYDRO was being used, at least within Hydrogen Technology, as part of a two-factor authentication application.

>           ii.       There was no evidence of any reasonable expectation of profits derived from others' efforts.

The third prong in the *Howey* test asks whether there is an expectation of profits to be "derived solely from the efforts of others." *Unique*, 196 F.3d at 1199. "To determine whether a transaction satisfies the 'expectation of profits' element, the Supreme Court has instructed [the courts] to examine if an investor is 'attracted solely by the prospects of a return on his investments' as opposed to whether 'a purchaser is motivated by a desire to use or consume the item purchased.'" *Fedance v. Harris*, 1 F.4th 1278, 1287 (11th Cir. 2021). In applying this element, "'solely' is not interpreted restrictively," *United States v. Wetherald*, 636 F.3d 1315, 1325 (11th Cir. 2011), and courts "look at both the motivations of the purchasers and the promotional materials associated with the offer and sale at issue." *Fedance*, 1 F.4th at 1288. But, ultimately, "[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation

39

of profits . . . ." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).

The Government provided no real evidence of what the *reasonable* expectations were. It introduced none (save a handful of social-media posts) of Hydrogen Technology's promotional material into evidence. It did not explain what contractual obligations Hydrogen Technology had to HYDRO's purchasers. And it provided no evidence that the purchasers knew they were buying HYDRO from Hydrogen Technology.

To be sure, the Government introduced the testimony of two purchasers. But the two purchasers had vague recollections, at best, of viewing Hydrogen Technology's website, its Discord, and information on Reddit. From the record, it is not clear what information the purchasers saw, and one purchaser admitted that he purchased HYDRO on speculation because other crypto tokens were doing well during the time. That purchaser, moreover, erroneously believed HYDRO to be cryptocurrency.

In a similar situation, the U.S. District Court for the Southern District of New York concluded that digital assets were not securities under the *Howey* test. In *SEC v. Ripple Labs, Inc.*, a crypto company

40

and its founders created a token called XRP. 682 F. Supp. 3d 308, 317 (S.D.N.Y. 2023). That crypto company sold the tokens to institutional buyers, like hedge funds, through written contracts, but it also sold XRP through exchanges using a trading algorithm. *Id.* The crypto company also provided marketing materials to the institutional buyers, which contained representations that the crypto company hoped to make money from XRP and had a business model dependent on XRP's success. *Id.* at 326–27. By contrast, the crypto company did not widely share those marketing materials with the public. *See id.* at 329.

At summary judgment, the district court in *Ripple* concluded that, sales to institutional buyers might be investment contracts under *Howey*. Yet, even at summary judgment, the sale of XRP to the public through exchanges could not be investment contracts, because the purchasers "could not reasonably expect" that the crypto company "would use the capital it received from its sales to improve the XRP ecosystem and thereby increase the price of XRP." *Id.* at 328.

In so holding, the district court noted four points. First, "a speculative motive on the part of the purchaser or seller does not evidence the existence of an 'investment contract'" because speculation

41

is not enough; what matters is "whether this speculative motive derived from the entrepreneurial or managerial efforts of others." *Id.* at 329 (quoting *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348 (1943) (internal quotation marks omitted). Second, the purchasers of XRP "could not have known if their payments of money went to" the crypto company or some "other seller of XRP." *Id.* at 328. Third, the purchasers of XRP on exchanges did not make those purchases based on contracts with the crypto company. Fourth, there was no evidence that the crypto company provided its promotional materials to the general public. *See id.*

All four points apply here. There was, at best, a minimal amount of evidence that any purchaser of HYDRO relied on Hydrogen Technology's promotional materials. Certainly, the Government introduced scant promotional material into the record, and little information of who in the public saw even those materials. Hydrogen Technology sold its tokens through an exchange, not a detailed sales agreement, and no purchaser could know if any of his or her money would go to enrich Hydrogen Technology, which could in turn use those funds to expand HYDRO.

42

And, lastly, there was no evidence that the purchaser's speculation was in any way reasonable. "The touchstone is the presence of an investment in a common venture premised on a *reasonable* expectation of profits . . . ." *Forman*, 421 U.S. at 852 (emphasis added); *see also SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005) (noting that *Howey*'s third element is not met when the realization of profits depends on market forces); *Ripple*, 682 F. Supp. 3d at 329 ("The inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant."). As the court in *Ripple* explained, "[i]t may certainly be the case that many [buyers] purchased XRP with an expectation of profit, but they did not derive that expectation from Ripple's efforts (as opposed to other factors, such as general cryptocurrency market trends)." *Id.* at 329. The same reasoning applies here.

B.    Given the Due Process Clause, a Jury Should Not Have Determined Whether HYDRO Constitutes a Security.

The Fifth Amendment's Due Process Clause requires that any statute "either standing alone or as construed," must make "it reasonably clear at the relevant time that the defendant's conduct was

43

criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997); *see also Dunn v. United States*, 442 U.S. 100, 112 (1979) ("[F]undamental principles of due process . . . mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited."). Given the lack of any guidance on whether crypto tokens constitute securities, Hampton lacked fair notice that his actions violated § 78i(a).

"Vagueness may invalidate a criminal statute if it either (1) fails 'to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits' or (2) authorizes or encourages 'arbitrary and discriminatory enforcement.'" *United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006) (quoting *Chicago v. Morales*, 527 U.S. 41, 56 (1999)). Here, § 78i(a) does both.

After all, it encourages arbitrary and discriminatory enforcement. *Howey*'s determination of whether something is an investment contract is a factual test based on the "totality of the circumstances." *SEC v. Merchant Cap., LLC*, 483 F.3d 747, 757 (11th Cir. 2007). Because of the *Howey* test, the Third Circuit correctly described "investment contract" as an "inherently vague term." *Ruefenacht v. O'Halloran*, 737 F.2d 320, 324 (3d Cir. 1984). That vagueness is all the more arbitrary if, as the

44

Government did here, a purchaser's subjective reason for investing can be presented to a jury so that the jury can ultimately decide whether a crypto token constitutes an "investment contract."

To be sure, courts have previously rejected similar challenges to § 78i's constitutionality. But *Wright v. SEC*, 112 F.2d 89, 94 (2d Cir. 1940) and *United States v. Minuse*, 142 F.2d 388, 390 (2d Cir. 1944), both pre-date *Howey* and so did not consider whether *Howey*'s test renders § 78i void for vagueness. In *United States v. Farris*, 614 F.2d 634, 642 (9th Cir. 1979), the Ninth Circuit rejected a similar challenge but provided little reasoning. And in *Wetherald*, this Court rejected a similar challenge because in that case, it was not "even difficult to classify the partnership interests involved." 636 F.3d at 1327.

By contrast, as the litany of legal literature on crypto assets shows, the question of whether a crypto token is a security is indeed a difficult one. *See generally* Kyle Bersani, Note, *Separating Governance Tokens from Securities: How the Utility Token May Fall Short of the Investment Contract*, 43 CARDOZO L. REV. 1305 (2022); Michael Mendelson, *From Initial Coin Offerings to Security Tokens: A U.S. Federal Securities Law Analysis*, 22 STAN. TECH. L. REV. 52 (2019); Nate

45

Crosser, Comment, *Initial Coin Offerings as Investment Contracts: Are Blockchain Utility Tokens Securities?*, 67 U. KAN. L. REV. 379 (2018). Given this unfairness both on notice and arbitrariness, Hampton's conviction on Count 1 should be overturned.

II.    THE CONVICTIONS ON COUNTS 1 AND 2 MUST BE OVERTURNED BECAUSE THERE WAS INSUFFICIENT EVIDENCE OF ANY AGREEMENT TO CONSPIRE BY HAMPTON.

As already noted, in Count 1, the Indictment alleged that Hampton conspired to violate § 78i; in Count 2, it alleged that Hampton conspired to commit wire fraud in violation of 18 U.S.C. § 1349. Both counts, therefore, require that the Government prove beyond a reasonable doubt that Hampton knowingly joined a conspiracy. *See United States v. Gonzalez*, 834 F.3d 1206, 1220 (11th Cir. 2016) ("To convict a defendant under § 1349, the Government had to establish . . . that the individual knowingly and voluntarily joined the conspiracy."); *United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015) ("To sustain the conspiracy conviction under 18 U.S.C. § 1349, the government must prove that (1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it."). Here, there was insufficient evidence to support Hampton's convictions on Counts 1 and

46

2, because there was no direct evidence of his knowledge of and agreement to the conspiracy.

"Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Maxwell*, 579 F.3d at 1299. The Government's main evidence against Hampton was the Slack channel communication, from which it asked jurors to draw the inference that Hampton had to know about the conspiracy given Ostern's statements on the channel.

Yet there was no direct evidence from anyone, including Hampton's supposed co-conspirators, that they explicitly told Hampton about the bot's illegal usage. Hampton lacked direct access to the Hydrogen Technology account used to make these transactions, and Hampton did not sell his tokens during the conspiracy. For his part, Chorlian testified that he never told Hampton that Moonwalkers' bot performed illegal activities. The agreement that Hampton signed mentions no illegal services—to the contrary, it mentions market making services, which the testimony explains is perfectly legal. And Ostern, who lied to Hampton and removed Hampton from nefarious e-

47

mail threads, could not keep a straight story on whether he informed Hampton about Moonwalker's bot.

The evidence, furthermore, showed that Hampton was busy with other obligations, which counsels against any finding that he must have read and understood every phrase and word written in the Slack channe.

Thus, the Government is left to cobble innuendo and inferences based on ambiguous but ominous sounding terms in Slack chats, with little to no proof that Hampton read those phrases, was aware of what was being written, or knew that the terms meant something illegal. That is insufficient for conviction.

III.   A NEW TRIAL IS REQUIRED BECAUSE OF THE DISTRICT COURT'S EVIDENTIARY AND JURY INSTRUCTION ERRORS.

Alternatively, the Court should remand the case for a new trial.

A.   The District Court Erred in Not Allowing Hampton To Instruct the Jury on His Theory of Defense.

A district court's "refusal to deliver a jury instruction requested by defendant constitutes reversible error if the instruction (1) is correct, (2) is not substantially covered by other instructions which were delivered, and (3) deals with some point in the trial so 'vital' that the failure to give the requested instruction seriously impaired the defendant's ability

48

to defend." *United States v. Opadahl*, 930 F.2d 1530, 1533 (11th Cir.

1991). Still, "[a] criminal defendant has the right to have the jury

instructed on her theory of defense, separate and apart from

instructions given on the elements of the charged offense." *United*

*States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995). The criminal

defendant's burden is "extremely low": "[T]he defendant . . . is entitled

to have presented instructions relating to a theory of defense for which

there is *any foundation* in the evidence." *Id.* (alterations in original). In

fact, the district court "is not free to determine the existence of such a

defense as a matter of law." *Id.* "Where the evidence presents a theory

of defense which has been called to the court's attention, refusal to

charge on that defense is reversible error." *United States v. Tashman*,

478 F.2d 129, 132 (5th Cir. 1973).[9]

Before the district court, Hampton asked the jury instructions

include "honest mistake of fact" instructions, which were approved as a

correct statement of law by this Court in *Ruiz*. *See Ruiz*, 59 F.3d at

1154. The district court rejected that argument because it concluded

---

[9] *Tashman* is binding precedent under *Bonner v. City of Prichard*, 661
F.2d 1206, 1207 (11th Cir. 1981) (en banc).

49

that Hampton did not reach his extremely low burden. Yet, at a minimum, Hampton was entitled to argue inferences from the admitted evidence that Hampton mistakenly believed there was no illegal conspiracy. Chorlian and Ostern both testified that there were legitimate market makers, that candle tools were not inherently illegal, and that Hampton was busy. From those facts, a jury could surely conclude that Hampton believed Moonwalkers was performing a legitimate function and was unaware of the market manipulation that Moonwalkers was undertaking for Hydrogen Technology.

What's more, Hampton's theory of defense was not covered by the remaining jury instructions, which covered intent generally, only. None of the instructions informed the jury that, if Hampton was mistaken about the meaning of a term or phrase used in the Slack channel or believed the term to mean something other than what the Government argued, it should not convict.

> B.    The District Court's Jury Instructions on Count 1 Misstated the *Howey* Test.

The district court, in its jury instructions, defined "common enterprise"—which is the second element under *Howey*—as "the individual buyer depended upon the efforts of Hydrogen [Technology]

50

for their returns, i.e., profits." [ECF No. 122 at 12] But this Court has defined the second *Howey* element differently, as the "fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Unique*, 196 F.3d at 1199; *Eberhardt*, 901 F.2d at 1580.

This difference is substantial. Indeed, as defined by the district court, the test appears subjective: Namely, was the individual buyer depending on Hydrogen Technology's efforts to obtain a return on investment? Whereas the language used by this Court is objective, and looks at the totality of the circumstances. *See Merchant Cap.*, 483 F.3d at 757. It asks for the jury to determine whether the fortunes are in fact interwoven, not whether the buyer—which a jury would conclude means the actual buyers who testified—depended. *See Forman*, 421 U.S. at 852 (noting that buyer's expectations were reasonable). This is a grave error that may have left the jury astray, especially since the bulk of the evidence provided by the Government on this issue was the purchaser's subjective intent in buying HYDRO tokens.

51

C.    The District Court's Evidentiary Determinations
      Cumulatively Prejudiced Hampton To Have an Unfair Trial.

Hampton's trial was fraught with errors that, cumulatively,

prejudiced him. Namely, the district court barred his expert from

explaining how blockchain technology works to the jury and prevented

Hampton from introducing other communications, including that Kane

told him and other Hydrogen employees that his decentralization plan

was approved by legal counsel. These errors, cumulatively, require

revers.

To begin with, district court excluded Hampton's expert witness as

irrelevant and likely to confuse the jury. But that was incorrect. The

expert applied his expertise in reaching his conclusion, and would have

provided context to the jury in making its decision of whether HYDRO

was a security. For instance, the expert was to testify that there was

regulatory uncertainty as to crypto assets during the time of the alleged

conspiracy, and that testimony would have provided a relevant

explanation for Hampton's state of mind when hiring Moonwalkers. *See*

*United States v. Sheffield*, 992 F.2d 1164, 1170 (11th Cir. 1993) ("The

trial judge excluded this evidence as irrelevant, reasoning that the base

practice of making authorized retirement gifts had no bearing on

52

whether Mr. Sheffield ordered fishing lures made for his own benefit. We disagree. Evidence of the gift-making custom was relevant to Mr. Sheffield's state of mind when he ordered the production of fishing lure molds.").

Next, in barring evidence that Hampton was advised that Hydrogen Technology's decentralization plan and hiring a market maker had been approved by legal counsel, the district court barred Hampton from proving his state of mind. And, given the Government's reliance on the Slack channels, Hampton's state of mind matters in interpreting those messages. And, of course, defendants in a conspiracy do not generally believe that their actions have been approved by the legal department. This evidence therefore went to the heart of intent, and the district court abused its discretion in barring it. *See United States v. Todd*, 108 F.3d 1329, 1333–34 (11th Cir. 1997) ("If Todd were able to introduce evidence of large employees' salaries and benefits, this evidence could be used to show that others had a strong interest in and motivation to save the company. This could have put quite a different spin on the question of Todd's intent and actions. By disallowing the

53

disputed evidence, the district court deprived Todd of a chance to rebut the government's intent argument.").

Nor can the district court's conclusion be saved by Federal Rule of Evidence 403. An explanation of what Hampton was told so that the jury could understand his motivations and state of mind is not unduly prejudicial. Besides, "Rule 403 is an extraordinary remedy which should be used sparingly." *United States v. Cross*, 928 F.2d 1030, 1048 (11th Cir. 1991).

At bottom, the Government provided the jury with communications among Ostern, Kane, Chorlian, Wolvaardt, and Hampton and asked that the jury draw from those communications the inference that, because Hampton was on them, he knew that Ostern was speaking of nefarious activity when he used phrases like "faux sell walls" or "volume shenanigans." Hampton sought to counteract this by explaining that he recommended legitimate market makers, was not told by Chorlian about the bot's illegal proclivities, and was assured that what was happening, despite the lack of guidance from authorities, had the legal department's blessing. The district court barred Hampton completely from presenting evidence on this last part. That is

54

cumulative error. *See Wetherald*, 636 F.3d at 1320 ("If the cumulative

effect of evidentiary errors is prejudicial, the court will reverse . . . .").

IV.    ALTERNATIVELY, THE CASE SHOULD BE REMANDED FOR
       RESENTENCING.

The case should be sent back for resentencing because the district

court erred in using Hydrogen Technology's gain as a proxy for loss and

because it misapplied the sophisticated-means enhancement.

A.    The District Court Erred in Finding a Loss of Over $1
      Million Under § 2B1.1 of the Sentencing Guidelines

      i.    Hydrogen Technology's gain should not have been used
            as a proxy for loss.

"Regardless of whether the sentence is inside or outside the

Guidelines range, the appellate court must review the sentence under

an abuse-of-discretion standard," and it must "ensure that the district

court committed no significant procedural error, such as failing to

calculate (or improperly calculating) the Guidelines range." *Gall v.

United States*, 552 U.S. 38, 51 (2007). The district court erred in

calculating the loss of this case as Hydrogen Technology's gain.

A defendant's gain may be used where "reasonable estimate of the

victims' loss based on existing" information is not "feasible." *United

States v. Bradley*, 644 F.3d 1213, 1289 (11th Cir. 2011) (citing U.S.S.G.

55

§ 2B1.1).[10] The district court summarily rejected that argument because gain actually "underrepresents the amount of the loss." [ECF No. 270 at 18:12–13] But that is no basis for rejecting this Court's holding in *Bradley*. "[T]he government bears the burden of proving by a preponderance of the evidence actual loss attributable to the defendant's conduct." *See Horn*, 129 F.4th at 1302. Because the Government failed to explain why it could not calculate loss, it did not meet its burden, and the district court abused its discretion in relying on gain, rather than loss.

ii.    Hydrogen Technology's gain was largely speculation.

Besides, the calculation of Hydrogen Technology's gain is largely speculative. To be sure, the "court may employ a variety of methods to derive a reasonable estimate of the loss to the victims based on the information available to the district court so long as that estimate is based on reliable and specific evidence and not the district court's speculat[ion] about the existence of facts." *United States v. Stein*, 846

---

[10] Before the district court, Hampton also argued that the word "loss" in the Sentencing Guidelines included only actual loss and could not include "gain." That argument is now foreclosed by *United States v. Horn*, 129 F.4th 1275, 1299–1300 (11th Cir. 2025).

56

F.3d 1135, 1153 (11th Cir. 2017) (alteration in original) (internal quotation marks omitted). And, of course, the district court's "loss determination is entitled to appropriate deference and will generally be upheld so long as it is reasonable." *Horn*, 129 F.4th at 1302 (quoting *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006)) (internal quotation marks omitted). But here the district court counted all of Hydrogen Technology's gain, even without any evidence that purchasers—other than the two who testified—relied on "fraudulent information" and would not have purchased HYDRO but-for the fraudulent information. *See Stein*, 846 F.3d at 1153. Given this, the district court erred in concluding the loss was $1.3 million.

B.    The District Court Plainly Erred in Applying the Sophisticated Means Enhancement.

At sentencing, the district court also applied a two-level enhancement against Hampton under § 2B1.1(b)(10) because he used sophisticated means. That was plain error.

"When a party does not object at the time of sentencing, the Court reviews for plain error." *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014). "To meet the plain-error standard," Hampton must establish that "(1) an error occurred," that "(2) the error was

57

obvious;" that (3) the error "affected his 'substantial rights in that it was prejudicial and not harmless;'" and that (4) the error "seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Bankston*, 945 F.3d 1316, 1318 (11th Cir. 2019) (quoting *United States v. Beckles*, 565 F.3d 832, 842 (11th Cir. 2009)). In the sentencing context, "once those conditions have been met, the court of appeals should exercise its discretion to correct the forfeited error." *Id.* (internal quotation marks omitted).

First, there was error. The provision on which the district court relied applies the sophisticated-means enhancement only if the "offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1.(b)(10)(C). Though the scheme was sophisticated, no evidence suggests that Hampton "intentionally engaged in or caused the conduct constituting sophisticated means." He did not manage Moonwalkers' bot, and he did not have access to Hydrogen Technology's Bittrex account. At most, Hampton spoke with others via electronic communications and signed a contract. Therefore, the district court erred in applying this enhancement.

58

The error, moreover, was plain, because the unambiguous language of the Guideline makes clear that the defendant must engage in the sophisticated means. It is not enough for the scheme to be sophisticated.

And of course, Hampton received an enhancement, which affects his substantial right: "A district court that improperly calculat[es] a defendant's Guidelines range, for example, has committed a significant procedural error." *Molina-Martinez v. United States*, 578 U.S. 189, 199 (2016) (alteration in original). And under Supreme Court precedent a miscalculation of the sentencing range will in the "ordinary case, as here, seriously affect the fairness, integrity, or public reputation of judicial proceedings, and thus will warrant relief." *Rosales-Mireles v. United States*, 585 U.S. 129, 132 (2018).

## CONCLUSION

For these reasons, the Court should overturn Shane Hampton's convictions on Counts 1 and 2 of the Indictment. Alternatively, the case should be remanded for a new trial or, if the Court concludes there was no reversible error at trial, for resentencing.

59

Respectfully submitted,

TOTH FUNES PA

/s/ Freddy Funes
Freddy Funes
Florida Bar No. 87932
Ingraham Building
25 Southeast Second Avenue
Suite 805
Miami, Florida 33131
(305) 717-7851
ffunes@tothfunes.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

As required by Federal Rule of Appellate Procedure 32(g), I, Freddy Funes, certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because this brief contains 11,464 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

April 2, 2025

/s/ Freddy Funes
Freddy Funes

60