No. 24-12236-A

# In the United States Court of Appeals for the Eleventh Circuit

————————

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

SHANE HAMPTON,
Defendant-Appellant.

————————

On Appeal from the United States District Court
for the Southern District of Florida
No. 1:23-cr-20172

————————

## BRIEF FOR THE UNITED STATES

————————

MATTHEW R. GALEOTTI
Head of the Criminal Division

ANDREW JACO
Trial Attorney, Fraud Section

DAVID M. LIEBERMAN
Attorney, Appellate Section
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 262-6805
david.lieberman@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

*United States of America v. Shane Hampton*
No. 24-12236-A

Undersigned counsel for the United States of America hereby certifies that the following is a complete list of persons and entities who have an interest in the outcome of this case.  Persons not included in the Certificate of Interested Persons set forth in Appellant's brief are listed in bold.

Argentieri, Nicole M.

Armstrong, Scott

Becerra, Hon. Jacqueline

Berke, Daryl

Charest-Turken, Gabrielle Raemy

Damian, Hon. Melissa

Funes, Freddy

**Galeotti, Matthew R.**

Goodman, Hon. Jonathan

Hampton, Shane

Jaco, Andrew

Kane, Michael

**Lieberman, David M.**

C-1 of 2

Llanes, Barbara R.

McDonald, Ian

Miller, Lisa H.

Morales, Eric E.

Norkin, Walter

Otazo-Reyes, Hon. Alicia M.

Reboso, Manolo

Reid, Lisette Hon.

Sanchez, Hon. Eduardo

Sanders, Jeremy R.

Seitz, Hon. Patricia A.

Sundy, Christopher

Torres, Hon. Edwin G.

Taylor, Mark

Toossi, Amir

Walsh, Daniel R.

Williams, Hon. Kathleen

Wolvaardt, George

/s/ David M. Lieberman

C-2 of 2

## STATEMENT REGARDING ORAL ARGUMENT

This criminal appeal advances straightforward sufficiency, evidentiary, and sentencing claims.  The government believes the facts and legal contentions are adequately discussed in the briefs, and that oral argument would not significantly aid the Court's decisional process.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .........................................C-1

STATEMENT REGARDING ORAL ARGUMENT....................................i

TABLE OF AUTHORITIES ..............................................................v

JURISDICTIONAL STATEMENT............................................................ 1

ISSUES PRESENTED .......................................................................... 1

STATEMENT OF THE CASE.................................................................. 2

I.    Statement of Facts ....................................................................... 2

    A.    Hampton's company created and distributed Hydro cryptocurrency tokens ................................................................ 3

    B.    Hampton hired the Moonwalkers firm to use deceptive tactics to increase Hydro's trading volume on cryptocurrency exchanges.... 4

    C.    Hampton monitored Moonwalkers as it placed fake and fraudulent orders for Hydro tokens ............................................................ 8

    D.    Hydro's trading volume increased in response to Moonwalkers' trading tactics ..................................................................... 13

    E.    A forensic audit documented the effect of Moonwalkers' tactics on the Hydro cryptocurrency market ............................................. 14

II.    Course of Proceedings....................................................................... 17

III.    Rulings Presented and Standards of Review ....................................... 18

SUMMARY OF ARGUMENT .................................................................. 20

ARGUMENT ........................................................................................ 24

I.    Ample evidence supports the jury's finding that the Hydro tokens were securities ................................................................................ 24

    A.    The jury supportably found the tokens to be investment contracts ................................................................................ 25

        1.  The evidence showed a common enterprise ......................... 25

        2.  The evidence showed that investors expected a return based on the efforts of others ............................................................. 27

    B.    Hampton's reliance on *Ripple Labs* is misplaced ......................... 32

    C.    Hampton's vagueness attack on the securities fraud statute is forfeited and without merit ....................................................... 35

II.   Ample evidence supports the jury's finding that Hampton knowingly agreed to participate in the market-manipulation tactics ..................... 38

    A.    The evidence supportably demonstrates that Hampton hired Moonwalkers to engage in manipulative trading tactics ............. 38

    B.    The evidence supportably shows that Hampton also guided Moonwalkers' manipulative trading tactics .............................. 41

III.  The district court appropriately exercised its discretion when excluding Hampton's cryptocurrency expert ....................................................... 43

IV.   The district court appropriately exercised its discretion when excluding evidence that Hampton learned that legal counsel had approved a decentralization plan and a market maker ......................................... 47

V.    No instructional error occurred ...................................................... 50

    A.    The district court correctly defined the term "securities" ............ 50

    B.    The district court appropriately exercised its discretion in refusing a mistake-of-fact instruction due to inadequate foundation ......... 52

VI.   No cumulative error occurred ...................................................... 56

iii

VII.   The district court correctly calculated the Sentencing Guidelines range ...................................................................................... 56

      A.     The district court made a reasonable estimate of gain ................ 56

      B.     The district court did not plainly err in applying the sophisticated-means enhancement................................................................ 61

CONCLUSION.................................................................................... 62

CERTIFICATE OF COMPLIANCE ...................................................... 63

# TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ........ 43, 44, 45

*Eberhardt v. Waters*, 901 F.2d 1578 (11th Cir. 1990) .....................25, 27, 51, 52

*Fedance v. Harris*, 1 F.4th 1278 (11th Cir. 2021) ............................................. 29

*Orkin v. S.E.C.*, 31 F.3d 1056 (11th Cir. 1994) .............................................. 47

*Puckett v. United States*, 556 U.S. 129 (2009) ................................................... 20

*Ruefenacht v. O'Halloran*, 737 F.2d 320 (3d Cir. 1984) ................................... 36

*Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678 (11th Cir. 2014) ............... 49

*S.E.C. v. Coinbase, Inc.*, 726 F. Supp. 3d 260 (S.D.N.Y. 2024) ............ 29, 30, 34

*S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005) ............. 23, 51, 52

*S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) ................................. 37

*S.E.C. v. Mut. Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005) ........................... 32

*S.E.C. v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. 2023) ...32, 33, 34, 35

*S.E.C. v. Ripple Labs, Inc.*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023) ..............33, 34

*S.E.C. v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170 (S.D.N.Y. 2023) ...29, 31

*S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195 (11th Cir. 1999) ..........27, 51

*S.E.C. v. W.J. Howey Co.,* 328 U.S. 293 (1946) .......20, 25, 30, 31, 32, 36, 37, 52

*Skilling v. United States*, 561 U.S. 358 (2010) ................................................. 35

*United States v. Azmat,* 805 F.3d 1018 (11th Cir. 2009) ................................. 18

*United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005) .................................. 56

*United States v. Barrington*, 648 F.3d 1178 (11th Cir. 2011) ........................... 61

*United States v. Barton*, 909 F.3d 1323 (11th Cir. 2018) ................................. 46

*United States v. Bazantes*, 978 F.3d 1227 (11th Cir. 2020) .............................. 20

*United States v. Brown*, 578 F.2d 1280 (9th Cir. 1978) ................................... 45

*United States v. Calderon*, 127 F.3d 1314 (11th Cir. 1997) .............................. 31

*United States v. Clough*, 978 F.3d 810 (1st Cir. 2020) .................................... 40

*United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) .................................... 58

*United States v. Crumbley*, 745 F.2d 1348 (11th Cir. 1984) ............................. 38

*United States v. Curtis,* 782 F.2d 593 (6th Cir. 1986) ..................................... 46

*United States v. Dennis*, 786 F.2d 1029 (11th Cir. 1986) ................................. 49

*United States v. Downs*, 61 F.4th 1306 (11th Cir. 2023) .................................. 40

*United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir. 1988) ..................... 46

*United States v. Foster*, 878 F.3d 1297 (11th Cir. 2018) .................................. 43

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (en banc) ..............43, 44

*United States v. Gayden*, 977 F.3d 1146 (11th Cir. 2020) ................................ 19

*United States v. Ghertler*, 605 F.3d 1256 (11th Cir. 2010) ............................... 20

*United States v. Graham*, 123 F.4th 1197 (11th Cir. 2024) .............................. 37

*United States v. Green*, 981 F.3d 945 (11th Cir. 2020) .................................... 56

*United States v. Horn*, 129 F.4th 1275 (11th Cir. 2025) .................................. 57

vi

*United States v. Johnson*, 921 F.3d 991 (11th Cir. 2019) .................................. 37

*United States v. Martinez*, 486 F.3d 1239 (11th Cir. 2007) .............................. 19

*United States v. Matthews*, 431 F.3d 1296 (11th Cir. 2005) ............................ 19

*United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009) .............................. 61

*United States v. Melgen*, 967 F.3d 1250 (11th Cir. 2020) ................................ 56

*United States v. Moriarty*, 429 F.3d 1012 (11th Cir. 2005) ............................. 37

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) ........................ 58

*United States v. Ruan*, 56 F.4th 1291 (11th Cir. 2023) ................................... 52

*United States v. Ruiz*, 59 F.3d 1151 (11th Cir. 1995) .................................52, 53

*United States v. Tucker*, 345 F.3d 320 (5th Cir. 2003) .................................... 45

*United States v. Vereen*, 920 F.3d 1300 (11th Cir. 2019) ................................ 54

*United States v. Wetherald*, 636 F.3d 1315 (11th Cir. 2011) ................. 21, 26, 36

*United States v. Williams*, 553 U.S. 285 (2008) .............................................. 35

*United States v. Woodard*, 531 F.3d 1352 (11th Cir. 2008) ............................. 19

*United States v. Zayyad*, 741 F.3d 452 (4th Cir. 2014) ................................... 53

## **Statutes, Rules, and Other Authorities**

15 U.S.C. § 78c ...........................................................................................1, 24

15 U.S.C. § 78i ............................................................................................. 24

18 U.S.C. § 371 ...........................................................................................2, 24

18 U.S.C. § 1349 ...............................................................................................2

18 U.S.C. § 3231 ................................................................................. 1

18 U.S.C. § 3742 ................................................................................. 1

28 U.S.C. § 1291 ................................................................................. 1

Fed. R. Crim. P. 52 .......................................................................... 20

Fed. R. Evid. 401 .............................................................................. 19

Fed. R. Evid. 403 .............................................................................. 19

Fed. R. Evid. 702 ................................................................... 21, 43, 44

U.S.S.G. § 2B1.1 .......................................2, 19, 23, 24, 56, 57, 58, 59, 60, 61

## JURISDICTIONAL STATEMENT

Defendant-Appellant Shane Hampton appeals the final judgment in this criminal case. The district court (Seitz, J.), which had jurisdiction under 18 U.S.C. § 3231, entered judgment on June 28, 2024. DE.199.[1] Hampton filed a timely notice of appeal. DE.206. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## ISSUES PRESENTED

1.      Whether sufficient evidence supports the jury's finding that the cryptocurrency token marketed by Hampton's company qualified as a security under 15 U.S.C. § 78c(a)(10), thus supporting his conviction for conspiracy to commit securities fraud.

2.      Whether sufficient evidence supports the jury's finding that Hampton conspired to fraudulently manipulate the price of the cryptocurrency token, thus supporting his convictions for conspiracy to commit securities fraud and wire fraud.

3.      Whether the district court abused its discretion when it excluded testimony from Hampton's expert as methodologically unsound and irrelevant.

---

[1] "DE" refers to the district court's docket entry number and pagination.

1

4.      Whether the district court abused its discretion when it excluded evidence that legal counsel had approved a decentralization plan and the hiring of a third-party market maker for the cryptocurrency.

5.      Whether the district court abused its discretion in instructing the jury on the elements of securities-fraud conspiracy and in declining to issue Hampton's proposed theory-of-defense instruction on mistake of fact.

6.      Whether the district court erred at sentencing in finding a $1.3-million gain and using that figure as the measure of loss associated with Hampton's offense conduct under Guidelines § 2B1.1(b)(1), or that Hampton's offense conduct employed sophisticated means under Guidelines § 2B1.1(b)(10).

## STATEMENT OF THE CASE

After a seven-day trial, a jury found Hampton guilty of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. The district court sentenced Hampton to 35 months of imprisonment.[2] DE.199.

## I.    Statement of Facts

Hampton worked as the head of financial engineering at Hydrogen Technology. DE.277:22. As recounted below, Hydrogen created the Hydro

---

[2] Hampton's co-defendant, Michael Kane, entered a guilty plea in connection with the same charges. Kane's appeal is pending before this Court in No. 24-12272-A.

2

cryptocurrency token, which the public could trade on public cryptocurrency exchanges. Starting in 2018, Hampton and others executed a scheme to manipulate Hydro's price. An outside firm retained by Hampton used an automated computer program, known as a bot, to place millions of dollars in fake and fraudulent orders for Hydro tokens. These orders, in turn, induced investors to purchase the tokens. As trading volume and Hydro's price increased, Hampton and his co-conspirators arranged to sell $1.5 million in tokens held by their company. Based on the evidence at trial, the jury found Hampton guilty of conspiracy to commit securities fraud and wire fraud.

### A. Hampton's company created and distributed Hydro cryptocurrency tokens.

Hampton worked at Hydrogen,[3] a robo advising firm founded by Michael Kane and his brother Matt.[4] DE.276:46-48. Hydrogen marketed back-end software to assist other companies with their own websites and applications. *Id*. at 47, 49. Hampton worked on financial and blockchain applications. *Id*. at 49.

In early 2018, Hampton and others at Hydrogen decided to create their own cryptocurrency. DE.276:51. Cryptocurrency is a virtual currency that exists on the Internet and is transferred on the blockchain, *id*. at 71—a

---

[3] The company was previously named Hedgeable. DE.276:46.

[4] References to "Kane" refer to Michael Kane unless otherwise noted.

distributed public ledger that records all transactions, *id*. at 40.  Individuals buy

or sell cryptocurrency tokens on an exchange.  *Id*. at 52.  Some tokens like

bitcoin had more value; others had less.  *Id*. at 71-72.

Another Hydrogen developer—Andrew Chorlian—wrote software that

created over 11 billion Hydro cryptocurrency tokens.  DE.276:54.  The Kane

brothers received 1.3 billion tokens each; Hampton and Chorlian received

approximately 280 million tokens each.  *Id*. at 56-57.

As for the remaining tokens, Hydrogen advertised a "developer air drop"

where individuals could apply for free Hydro tokens based on their reported

experience writing code and their proposals for Hydro-based applications.

DE.276:57.  At the time, however, the tokens had no practical uses. *Id*. at 59.

Hydrogen also listed Hydro tokens for sale on several cryptocurrency exchanges.

*Id*. at 59, 72.  But the markets were volatile, and the company could not sell its

desired number of tokens on some days due to insufficient trading volume.  *Id*.

at 60.  "[T]he price would have gone down by a good amount" if Hydrogen had

sold its tokens during low demand.  *Id*. at 61-62.

**B.    Hampton hired the Moonwalkers firm to use deceptive tactics to increase Hydro's trading volume on cryptocurrency exchanges.**

Starting in mid-2018, Hydrogen struggled to sell its applications and to

meet its payroll.  DE.276:68-69.  The company also could not sell its Hydro

tokens because the market did not have enough liquidity or interest.  DE.278:12.

Hampton led a search for a firm to help Hydrogen sell its tokens.  DE.276:73.

1.      Moonwalkers was a market manipulator.  DE.278:9.  The firm used deceptive trading practices to influence investors.  *Ibid.*  In particular, Moonwalkers developed software to give the appearance of real buyers and sellers for a cryptocurrency token.  *Id.* at 13.  This fake trading volume then influenced investors to purchase the token.  *Id.* at 14.

Moonwalkers specifically developed a trading bot that connected to a cryptocurrency exchange and continuously bought and sold tokens.  DE.278:15-16.  The bot used three tactics:

- Wash trading, which is "simply buying your own token."  DE.278:14-15.  Such trades "giv[e] the appearance that a bunch of people [are] trading" when "it was just [the] bot."  *Id.* at 17.

- Spoof orders, which refers to "an order that is placed without the intent to execute."  DE.278:20.  The bot "would create buy orders … giving the appearance that tons of people wanted to buy."  *Id.* at 24.  It then cancelled them when trading approached the listed price.  *Id.* at 26.

- The candle tool, which exploited a visual display on cryptocurrency exchanges showing a token's recent price movement; a green candle means an increasing price and a red candle means a decreasing price.

DE.278:98-99.   The bot placed a small buy order at an opportune moment to manipulate the display to show a green candle and make the token look good to investors.  *Id.* at 99-100.

The bot executed trades "[v]ery quickly"; it placed tens of thousands of orders in seconds.  DE.278:37.  The bot also functioned semi-autonomously using price and frequency parameters set by Moonwalkers.  *Id.* at 40.

2.   During a Skype call in August 2018, the president of Moonwalkers (Tyler Ostern) demonstrated the bot to Chorlian.  DE.276:73-74, DE.278:48. Chorlain explained that Hydrogen needed a market maker to help sell the Hydro tokens with a minimal negative impact on their price.  DE.276:74.  Ostern displayed the bot's features, including the spoof orders, wash trading, and candle tool.  DE.276:74, DE.278:49.  Chorlian understood that the features "show[ed] to everyone on these exchanges a level of demand and interest that isn't actually there."  DE.276:78.

In September 2018, Ostern followed up.   DE.278:50.   Hampton responded, and the men resumed the conversation about Moonwalkers' services and contract terms.  *Id.* at 50-53.  Hampton confirmed interest in having Moonwalkers sell the Hydro tokens held by Hydrogen in a manner that would not hurt the price.  *Id.* at 53.  Ostern also described the features of the Moonwalkers bot to Hampton.  *Id.* at 54, 80.

6

After the call, Ostern told a colleague that Hydrogen would pay $9,000 in bitcoin to Moonwalkers each month for its services. DE.278:56-57. Ostern and his colleague then reviewed their manipulation plan for the Hydro tokens on the Bittrex cryptocurrency exchange, including the need to obtain working capital from Hydrogen to place the spoof orders and wash trades. *Id*. at 81-85. According to Ostern, "our whole objective [was] to make our client money," *id*. at 87, by "manipulating the price upward while selling their coins in such a way that it doesn't hurt their price," *id*. at 86.

3. On October 1, 2018, Hampton messaged Kane that Moonwalkers wanted $2.5 million in bitcoin to support their trading tactics. DE.138-6:1. Hampton advised that "we need to distinguish between market making," which facilitates sales and purchases between other parties, "and getting liquidity" by getting investors to buy the Hydro tokens held by Hydrogen. *Ibid*.; *see also* DE.276:84. Hampton also clarified: "we can tell [Moonwalkers] that liquidating the HYDRO is the priority." DE.138-6:1. Kane agreed: "yea liquidity is really what you are doing." *Id*. at 2. Finally, Hampton explained that the Moonwalkers "bot is the best." *Ibid*. Kane responded that the decision was "[r]eally up to" Hampton. *Ibid*.

In a follow-up email to Ostern, Hampton offered a smaller bitcoin infusion to support Moonwalkers' tactics. DE.278:88-89. The men also negotiated

several other matters. *Id*. at 89-90. Hampton then confirmed internally that Hydrogen's trading accounts on two cryptocurrency exchanges—Bittrex and Coinex—had sufficient Hydro tokens and bitcoin to support Moonwalkers' activities. DE.276:92-95. Finally, Hampton signed the contract on Hydrogen's behalf retaining Moonwalkers for three months. DE.278:94-95.

### C.    Hampton monitored Moonwalkers as it placed fake and fraudulent orders for Hydro tokens.

Moonwalkers executed its tactics with the goal of creating upward or downward price spikes in the cryptocurrency market. DE.278:96. If investors saw a price increase, they might be influenced to buy Hydro tokens. *Ibid*. Conversely, a price drop might trigger investors to sell Hydro tokens to Moonwalkers for cheap. *Ibid*. Other buyers would then be left to buy at a higher price listed by Moonwalkers. *Ibid*. Ostern summarized the strategy: "Pump the price, undermine the support, get the sheep to buy." *Ibid*.

Moonwalkers and Hydrogen operated a Slack channel to discuss these trading tactics and their effect on Hydro's price and trading volume. DE.137-1; DE.276:97-98. Hampton participated in the discussions and, at times, guided and coordinated Moonwalkers' activities.

8

*October 2018*

In one exchange, Ostern demonstrated the Moonwalkers candle tool. DE.137-1:6.  He also set an initial goal of selling 10 million Hydro tokens daily on Hydrogen's behalf and sought assurances that Moonwalkers would have capital to push the price back up and build liquidity. *Id*. at 7.  Kane agreed. *Ibid*. Days later, Ostern proposed to "in[cite] a firesale to shake the weak hands, and get the sell walls to move down a bit so we gain position [and] then push [the] price hard."[5] *Id*. at 10.  Kane responded that "[Hampton] is owning this going forward" and directed Ostern to "chat with him." *Ibid*.  Hampton responded: "we can chat tomorrow." *Ibid*.

At month's end, Ostern advised that some "people [had] put[] up some pretty big sell walls [that] we need to get out of the way if we want the price to go up much." *Id*. at 15.  This meant that Hydro tokens had been listed for sale in large numbers and that Moonwalkers would need buying power to move the market above the listed price.  DE.276:130.  Ostern outlined three options: (1) Hydrogen should get into the trade chat and build trust in the Hydro token;

---

[5] Chorlain testified that this tactic "tri[ed] to get rid of people who are going to be fast to sell" their Hydro tokens and substitute in "people … who are more interested in holding the token long term."  DE.276:119.  Moonwalkers could then use other manipulative tactics to "push the price back up with a new set of holders who have more conviction." *Id*. at 120.

9

(2) "nuke it and hope the walls move down," meaning incite a fire sale of Hydro tokens, buy the sell orders, and resell the tokens later when the price climbs; or (3) "spend a little in transaction fees and pump volume again for some attention." DE.137-1:15. Hampton vetoed the first option ("We try to not get involved in any talks involving trading on our telegram or social media") and approved the third option ("Spending some on txn fees is fine"). *Ibid*.

Finally, another Moonwalkers employee asked: "How many more HYDRO tokens are you guys looking to offload in total?" *Id.* at 22. Hampton responded: "We still have a large chuck of total token supply to offload … a few billion tokens." *Id.* at 23. Hampton further advised that the offloading should occur "over time … 6-24 months." *Ibid*. Such sales generated money for Hydrogen. DE.276:136.

<em>November 2018</em>

Moonwalkers requested a payment from Hydrogen to keep going "[w]ith less blatant volume manipulation, and only subtle [market-making] tactics employed." DE.137-1:26. Kane directed Hampton to "take care of it," and Hampton asked for Moonwalkers' bitcoin address to transmit payment. *Ibid*. Ostern provided the address. *Id.* at 27.

10

*December 2018*

Ostern requested "another reload" of Hydro tokens so Moonwalkers could "try and push hard over the next week." DE.137-1:33; DE.276:147-148. Ostern also posted a depth chart showing pending buy and sell orders for the token alongside a heart symbol. *Ibid*. According to the trial testimony, Moonwalkers had "us[ed] their spoof orders to make the de[pth] chart look better" by displaying "a lot of money lined up to purchase the tokens" and "indicat[ing] that the price could go up." DE.276:148-149. Hampton responded that "reload is pending," DE.137-1:34, meaning Hydrogen would provide the Hydro tokens to support these orders, DE.276:149-150.

Later in the month, Hampton instructed Moonwalkers to halt trading for four days. DE.137-1:43. When Ostern inquired, Kane advised that Moonwalkers could still provide "candle stuff/support" for trading Hydro tokens, *id.* at 44, but not with the bitcoin that Moonwalkers had generated for Hydrogen through its token sales because the company needed to sell it to take advantage of a tax loss, *id.* at 43. Kane explained that "[Hampton] just didn't want [Moonwalkers] to use any more [bitcoin] for now since we are selling it." *Id.* at 44. Ostern understood. He said he would "let it off the board slowly"

11

because "you … don't want to cause a firesale."[6] *Ibid.* Hampton confirmed that his instructions pertained only to "the surplus [bitcoin] balance we have." *Ibid.*

*January 2019*

Ostern said that "[s]ome big boys came to play" and were "selling some large swatches" of Hydro tokens on the exchange. DE.137-1:46. These sales were large enough to reach the spoofed buy orders that Moonwalkers had placed and the bot "couldn't execute fast enough" "to move out of the way." DE.278:106. As a result, Moonwalkers had inadvertently purchased tokens, and the market price dropped. DE.278:106-107. Ostern advised that he was "[g]oing to turn up [the] buy candle increment to start buying a little more aggressively." DE.137-1:47.

Days later, Ostern noted that the Moonwalkers contract would soon expire and asked about renewal. *Id.* at 48. Hampton responded that "we generally like the terms" and asked about extending the tactics to a second cryptocurrency exchange. *Id.* at 49. Ostern replied: "I think that's agreeable … Just shoot for something big." *Ibid.*

At the same time in a private Slack message, Kane asked Hampton whether they had any "option but to renew the Moonwalkers contract."

---

[6] Ostern testified that stopping all Moonwalkers activities would cause orders to disappear from the market, induce a fire sale of Hydro tokens, and trigger a price drop. DE.278:105.

12

DE.138-9:1.  Hampton responded that a renewed contract with Moonwalkers was the only option for selling Hydrogen's tokens.  *Ibid*.  Kane asked whether Moonwalkers' price was fair.  *Ibid*.  Hampton responded that it was "on par or lower than the other firms"; Hampton had received "one quote lower" from a different firm that then "ghosted me and took down their own website.  *Id.* at 2.

Hydrogen renewed the contract, and Ostern provided a bitcoin address for payment.  DE.137-1:51; DE.278:109.

### D.    Hydro's trading volume increased in response to Moonwalkers' trading tactics.

Moonwalkers' efforts proved successful.  On certain days, the Hydro token had the top trading volume on the Bittrex exchange.  DE.276:168; *see also, e.g.*, DE.137-1:14 (Ostern: "#1 volume on bittrex.").  Around half the volume was fake and bot generated.  DE.137-1:14.

Retail investors noticed the trading volume, believed it was real, and purchased Hydro tokens.  One investor explained that volume demonstrated interest in the token and "legitimacy that [Hydrogen] had a longer term goal." DE.277:173.  It also meant that "if you ever go to sell" the token, "there's people that would want to … in[vest]." *Id*. at 174.  Another investor noticed that Hydro

13

"was becoming more popular," and the volume "suggested there w[ere] more people interested in buying and selling the token." *Id*. at 191.

During this period, Moonwalkers sold numerous Hydro tokens on Hydrogen's behalf at favorable prices. DE.276:164. Those sales generated over $1.5 million in bitcoin for Hydrogen. DE.279:172-173.

Moonwalkers continued its tactics through March 2019. DE.278:113. As it did, Ostern asked on the Slack channel with Hampton and Kane about Hydrogen's clients and their Hydro tokens. DE.137-1:55. Kane explained that Hydrogen's clients "aren't required to use [the token] in any part of [Hydrogen's] platform right now" and agreed that "the token has no real utility." *Ibid*. Kane further noted that "incentivizing people to [build business applications for the token] when the token is worth nothing is hard." *Ibid*.

### E. A forensic audit documented the effect of Moonwalkers' tactics on the Hydro cryptocurrency market.

An FBI forensic accountant reviewed market data from the Bittrex exchange, including all buy orders, sell orders, and cancelled orders for the Hydro token between August 2018 and August 2019. DE.279:159-160. The records (DE.138-27:1) show a significant portion of all Hydro token purchases came from Hydrogen's trading account during the period when Moonwalkers had operated its bot on Hydrogen's behalf.

14



The records (DE.138-27:3) also show numerous wash trades where the Hydrogen account simply purchased tokens from itself.



Finally, the records (DE.138-27:6) contain evidence of spoof orders—*i.e.*, orders to buy tokens that Hydrogen had no intention of executing. For instance,

15

in October 2018, the average price of an executed order to buy tokens from Hydrogen was $429 whereas the average price of a placed but later cancelled order to buy tokens from Hydrogen was over $37,000.



The Hydrogen account also placed, and then cancelled, buy orders for hundreds of millions of tokens starting in October 2018 (DE.138-27:6).



16

## II.    Course of Proceedings

A grand jury in the Southern District of Florida returned an indictment charging Hampton with conspiracy to commit securities fraud, conspiracy to commit wire fraud, and two counts of wire fraud.[7]  DE.3.

Before trial, the district court excluded Hampton's expert on blockchain technology because the proffered testimony was irrelevant, not supported by reliable methodology, and not helpful to the jury's understanding of the evidence.  DE.107.  The court further excluded evidence that Kane had told Hampton that legal counsel had approved a decentralization plan and the hiring of a market maker for the Hydro token: "Because the legality of market makers and Hydrogen's decentralization plan … is uncontested, this derivative advice of counsel statement … would not be probative to negate an intent to defraud and would confuse and distract the jury with irrelevant evidence."  DE.90:10.

At trial, the jury heard the evidence catalogued above.  The government also introduced evidence that Hampton had suggested wash trading of the

---

[7] On April 7, 2025, the Deputy Attorney General released updated guidance concerning charging securities-fraud violations in cases involving digital assets. *See* Memorandum from the Deputy Attorney General to All Department Employees, Ending Regulation by Prosecution, at p.3 (Apr. 7, 2025), *at* https://www.justice.gov/dag/media/1395781/dl?inline.  Hampton was charged, convicted, and sentenced before this policy went into effect.  The government's argument here is limited to defending the sufficiency of the evidence supporting the jury's verdict.

Hydro token one month before retaining Moonwalkers. Kane, Hampton, and Chorlian disagreed with the token valuation reported by the Coin Market website and "talk[ed] through different means to get them to change the number." DE.276:152-153. During this discussion, Hampton proposed to "sell our tokens and/or sell them to each other" to depict an increased token supply. DE.138-5:3.

Hampton presented his defense. In crafting jury instructions, the district court overruled Hampton's objections to its charge defining the elements of securities-fraud conspiracy, DE.274:35, DE.280:141-142, and declined Hampton's request to instruct on a mistake-of-fact defense, DE.280:155-156.

The jury found Hampton guilty of the two conspiracy counts and acquitted him of the two substantive counts predicted on two specific bitcoin payments from Kane to a Moonwalkers conspirator. DE.121. The district court sentenced Hampton to 35 months of imprisonment. DE.270:69.

## III.  Rulings Presented and Standards of Review

Hampton raises two sufficiency-of-the-evidence challenges. He disputes the evidence showing that the Hydro token qualifies as a security and that he knowingly joined a conspiracy to engage in securities fraud and wire fraud. This Court conducts a de novo review of these claims, *see United States v. Azmat,* 805 F.3d 1018, 1035 (11th Cir. 2009), and examines "whether the evidence, when

18

viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the fact-finder, would enable the trier of fact to find the defendant guilty beyond a reasonable doubt," *ibid.* (citation omitted). This Court will affirm unless "no reasonable construction of the evidence" supports the jury's finding of guilt. *Ibid.* (citation omitted).

Hampton challenges the district court's exclusion of the defense expert and of communications that legal counsel had approved a decentralization plan and a market maker for the Hydro tokens. This Court reviews these evidentiary rulings for abuse of discretion. *See United States v. Gayden*, 977 F.3d 1146, 1153 (11th Cir. 2020) (expert); *United States v. Matthews*, 431 F.3d 1296, 1308 (11th Cir. 2005) (Federal Rules of Evidence 401 and 403).

Hampton assigns error to the district court's jury instruction regarding the elements of securities-fraud conspiracy and the court's refusal to give his theory-of-defense instruction. The former presents a question of law subject to de novo review. *See United States v. Martinez*, 486 F.3d 1239, 1244 n.2 (11th Cir. 2007). The latter is reviewed for abuse of discretion. *See United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008).

As to sentencing, Hampton challenges the district court's loss calculation under Guidelines § 2B1.1(b)(1), and sophisticated-means enhancement under Guidelines § 2B1.1(b)(10). This Court reviews the method of calculating loss de

19

novo and determination of the amount for clear error. *United States v. Bazantes*, 978 F.3d 1227, 1249 (11th Cir. 2020). It reviews the sophisticated-means finding for clear error. *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010).

This Court reviews an unpreserved claim for plain error under Federal Rule of Criminal Procedure 52(b). In that circumstance, the defendant must show a legal error that is "clear or obvious, rather than subject to reasonable dispute," affects his substantial rights, and so seriously undermines the fairness, integrity, and public reputation of judicial proceedings that this Court should exercise discretion to correct it. *Puckett v. United States*, 556 U.S. 129, 135 (2009).

## SUMMARY OF ARGUMENT

1.    Ample evidence supports the jury's finding that the Hydro tokens were investment contracts and, therefore, securities under federal law. The trial testimony confirmed that the individuals who purchased the tokens tethered their fortunes to Hydrogen's business plan. They had no responsibility for the token's development and no role in promoting the token's use for software applications. The testimony also showed that Hydrogen promoted the tokens, and investors were attracted to them, based on the prospects of a return. The jury thus reasonably found that the Hydro tokens were investment contracts under the definition in *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293 (1946).

20

The Court should reject Hampton's vagueness attack on the statutory definition of "investment contract," which he raises for the first time on appeal. This Court (among many others) has long interpreted the term in accordance with the *Howey* definition without difficulty or arbitrariness. This Court also rejected a similar vagueness challenge in *United States v. Wetherald*, 636 F.3d 1315 (11th Cir. 2011). Hampton therefore cannot demonstrate a plain or obvious defect in the statutory definition.

2.     Ample evidence likewise supports the jury's finding that Hampton knowingly agreed to participate in the market-manipulation tactics. The testimony showed that Ostern described Moonwalkers' manipulative trading tactics to Hampton during a call. Shortly thereafter, Hampton sought to hire Moonwalkers because "their bot is the best." DE.138-6:2. Subsequent communications on the Slack channel show that Hampton monitored and approved deceptive trading tactics with respect to the Hydro tokens. A reasonable jury, viewing this evidence in a light most favorable to the government, could conclude that Hampton understood Moonwalkers' deceptive trading tactics, retained the firm precisely because those features would help Hydrogen sell its tokens, and then supervised the firm's manipulative trades.

3.     The district court appropriately exercised its discretion under Federal Rule of Evidence 702 when excluding Hampton's expert. The expert's

21

proffered testimony—that a reasonable person could not know whether the Hydro tokens were a security in 2018— was not relevant to the charged offenses. The court also permissibly determined that the expert failed to apply scientific, technical, or specialized expertise in reaching his conclusion.

4.    The district court appropriately exercised its discretion when excluding evidence that Hampton learned that legal counsel had approved a decentralization plan and the hiring of a market maker. The charged offenses did not involve the decentralization plan or the hiring of a market making firm. They instead turned on evidence that Hampton fraudulently engaged in market manipulation through wash trading and spoof ordering of the Hydro token. Any perceived legality in the decentralization and market-making plans had no bearing on the question whether Hampton intended to engage in wash trading and spoof ordering.  The court thus permissibly excluded this evidence as irrelevant and distracting.

5.    No instructional error occurred.  With respect to the Count One securities-fraud conspiracy, the district court defined an investment contract as "an investment of money," "in a common enterprise," "with the expectation of profits to be derived solely from the entrepreneurial or managerial efforts of Hydrogen and other HYDRO promotors."   DE.280:166-167.   It further explained that a "common enterprise" means "the individual buyer depended

22

upon the efforts of Hydrogen for their returns: i.e., profits." *Id.* at 167. Because this description of common enterprise tracked this Court's language in *S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005), no error occurred.

The district court also appropriately exercised its discretion in refusing Hampton's request for a mistake-of-fact instruction. The court invited Hampton to identify record evidence showing that he had mistaken Moonwalkers as a legitimate marker-making firm; his counsel cited nothing. The court thus permissibly denied this instruction due to a lack of foundation. But even if the court erred, reversal is unwarranted because its remaining instructions permitted Hampton to present his desired defense. Hampton freely argued at closing that he lacked knowledge of Moonwalkers' manipulative trading tactics and instead believed the firm provided legitimate services. If the jury credited that defense, the court's instructions required it to acquit because Hampton would have lacked knowledge of the conspiracy's unlawful purpose.

6.    No error occurred at sentencing. Based on the size of the market manipulation, the sophisticated tactics employed, and the fact that market manipulation on the Bittrex exchange influenced the tokens' price on other exchanges, the district court permissibly concluded that investor loss could not be reasonably calculated, and that Hydrogen's gain reflected an appropriate measurement under Guidelines § 2B1.1(b)(1). All parties further agreed below

that Hydrogen had collected $1.3 million in U.S. dollars from its token sales during the conspiracy.

The district court also did not plainly err in applying the sophisticated-means enhancement under Guidelines § 2B1.1(b)(10). The offense involved sophisticated means, and Hampton intentionally engaged in or caused the conduct constituting sophisticated means. In particular, the trial evidence showed that Hampton understood the bot's manipulative trading features, retained Moonwalkers because those features would help Hydrogen sell its Hydro tokens, and later monitored and guided Moonwalkers' tactics. The district court, as factfinder, permissibly credited this evidence.

## ARGUMENT

**I.    Ample evidence supports the jury's finding that the Hydro tokens were securities.**

Count One alleged that Hampton conspired to commit fraud with respect to active trading of, or a series of transactions in, a "security," in violation of 15 U.S.C. § 78i(a)(1)-(2) and 18 U.S.C. § 371. DE.3:4-5. The term "security" includes an "investment contract." 15 U.S.C. § 78c(a)(10). The government argued at trial that the sale of Hydro tokens were investment contracts.

At the close of trial, Hampton alleged insufficient evidence that the tokens were securities and sought a judgment of acquittal. DE.281:125-126. The

24

district court denied the motion, citing evidence that Hampton sold the tokens as "an investment to raise capital for Hydrogen and make Hydrogen have value as a company." *Id.* at 127. Hampton appeals (Br.35-46) this ruling, but his challenge lacks merit.

### A. The jury supportably found the tokens to be investment contracts.

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey,* 328 U.S. at 298-299. Hampton does not contest that the scheme here involved the investment of money. He instead disputes (Br.35-43) the evidence establishing a common enterprise or an expectation of profits based on a third party's efforts. Neither challenge is persuasive.

### 1. The evidence showed a common enterprise.

"A common enterprise exists where the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990) (internal quotation marks and citation omitted). "The thrust of the common enterprise test is that the investors have no desire to perform the chores necessary for a return." *Id.* at 1580-1581. Evidence that investors lacked

25

"control over the enterprise" or a "vote on important decisions," "had no power," and "merely provided funding" with "no say in the operations" is "more than sufficient to allow the jury to conclude that … these were securities." *United States v. Wetherald*, 636 F.3d 1315, 1326 (11th Cir. 2011).

The evidence well supports this inference. Hydro tokens had no practical utility during the conspiracy period. DE.137-1:55; DE.276:59. Hydrogen instead sold them to "[p]eople who were interested in speculating on the market or investing." DE.276:59. The objective: "get the sheep to buy" the tokens, DE.278:96-97, and support their liquidity and price on the cryptocurrency markets. *See* DE.137-1:10 (Hampton offering to chat about plan to ""in[cite] a firesale to shake the weak hands, and get the sell walls to move down a bit so we gain position [and] then push [the] price hard."). This dynamic demonstrates that investors had no role in increasing Hydro's value; their fortunes were instead interwoven with and dependent on Hydrogen's efforts.

In response, Hampton cites (Br.38-39) testimony that Hydro had been designed as a utility token and distributed to developers for use in their projects and for authentication. The common-enterprise prong, however, "looks to the economic reality" of the token at the time the sales occurred. *Wetherald*, 636 F.3d at 1325. As the district court correctly explained, the "utility token … was not a reality" "at the time [the tokens] were selling." DE.281:127. Kane himself

26

acknowledged on the Slack channel that the tokens "ha[d] no real utility … right now" and were "worth nothing." DE.137-1:55. The jury thus supportably concluded that the individuals who purchased the token joined a common enterprise that tethered their fortunes to Hydrogen's business plan.

### 2. The evidence showed that investors expected a return based on the efforts of others.

The expectation-of-profits prong asks whether an investor's purchases were "'premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'" *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1201 (11th Cir. 1999) (citation omitted); *see also Eberhardt*, 901 F.2d at 1581 (asking whether "the average investor needed to rely on [others] in order for the venture to be a success"). Because the trial evidence showed that the scheme dangled the prospects of investment returns to token purchasers based on Hydrogen's business efforts, it satisfied this prong.

Hydrogen hosted an official forum on the Telegram messaging application, DE.276:128, and Chorlian posted information there (among other places) about the blockchain technology supporting the Hydro token, *id*. at 184-185. The company also advertised the token's protocol on its website and used "decentralization ambassadors" to promote the token. DE.277:41-42. Finally,

Kane used the Telegram forum to tout Hydrogen's success, the company's efforts to promote the token, and its adoption in the market:

- Hydro is "in a lot of the tech hubs," "winning awards," and "expanding the reach." "[W]e are on a good track!" The token's listing on one or two larger cryptocurrency exchanges "should be sufficient, we just want to make sure there is a liquid ecosystem since the token will get heavy use in the coming years." DE.138-17.

- "The community shouldn't be too worried about [price declines in the cryptocurrency markets] in relation to Hydro since the platform is growing everyday. It's a utility ecosystem, and the utility gets stronger and stronger. The product is coming along amazingly well, along with adoption." DE.138-18.

- "[W]e have about 40 platforms implementing, just takes a bit of time to test. We also have a Wordpress plugin for any one of 75 million sites, salesforce, chrome, [and] shopify plugins coming soon. One of the testers of the app has 2 million customers, so just be patient and users will come." *Ibid.*

- "Hydrogen is a very large platform, Hydro is a large product set underneath that platform, and HYDRO is a utility token within the platform. We are focused on getting adoption of the platform by

28

businesses and consumers and people using the token along with it. To get there, we are putting a lot of time and effort into product development." DE.138-19.

Viewing this evidence in a light most favorable to the government, the jury could easily find that these statements "repeatedly encouraged investors to purchase tokens by advertising the ways in which their technical and entrepreneurial efforts would be used to improve the value of the asset." *S.E.C. v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 292 (S.D.N.Y. 2024).

"[T]he motivations of the purchasers" supply further proof for this expectation-of-profits prong. *Fedance v. Harris*, 1 F.4th 1278, 1288 (11th Cir. 2021). Two investors testified that they expected a return on their token purchases based on Hydrogen's development and growth efforts. One testified that Hydrogen "looked like they were building out an ecosystem" and "seemed like they had a plan." DE.277:171. He believed the Hydro token would do well because of the company's blockchain protocols and developing ecosystem. *Id*. at 182. A second investor testified that Hydrogen "seemed to have a pretty legitimate development plan" that "listed … future ideas and … steps that … they were going to pursue for HYDRO." *Id*. at 188-189. In his view, "the road map showed potential for development and growth." *Id*. at 197.

29

Simply put, the scheme intended to convey, and purchasers were motivated by, a possible return on investment.

Hampton's rejoinders lack merit. He asserts (Br.40) that "[t]he Government provided no real evidence of what the reasonable expectations were." As just noted, however, both the company and Kane touted the Hydrogen platform and the Hydro token to the public. That, in turn, provided the jury with a foundation to find that the investors reasonably expected future value and returns. *See S.E.C. v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 196 (S.D.N.Y. 2023) (requirement satisfied "[i]f an objective investor would have perceived the defendants' statements and actions as promising the possibility of such returns"). Testimony from the two investors provided further confirmation: they purchased the tokens with an expectation of profit tethered to Hydrogen's efforts to develop and promote the tokens.

Hampton further states (Br.40) that the government "did not explain what contractual obligations Hydrogen Technology had to HYDRO's purchasers" and "provided no evidence that the purchasers knew they were buying HYDRO from Hydrogen." But the expectation-of-profits prong does not turn on the presence of a formal contract. "[I]t is enough that the [defendants] merely offer the essential ingredients of an investment contract." *Howey*, 328 U.S. at 301; *see also Coinbase*, 726 F. Supp. 3d at 289 ("[T]here need not be a formal contract

30

between transacting parties for an investment contract to exist under *Howey*.").

The prong also does not require a direct buyer-seller relationship. Rather, the

term "investment contract" simply means a "scheme for the placing of capital

or laying out of money in a way intended to secure income or profit from its

employment." *Howey*, 328 U.S. at 298 (internal quotation marks and citation

omitted); *see also Terraform Labs*, 684 F. Supp. 3d at 197 ("*Howey* makes no such

distinction between purchasers … That a purchaser bought the coins directly

from the defendants or, instead, in a secondary resale transaction has no impact

on whether a reasonable individual would objectively view the defendants'

actions and statements as evincing a promise of profits based on their efforts.").

Hampton further characterizes (Br.40) the investors' recollections as

"vague," but fails to explain why the jury could not credit them. *See United States

v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997) ("It is well established that

credibility determinations are the exclusive province of the jury.") (internal

quotation marks, brackets, and citation omitted). The investors testified that

their review of Hydro's development plan led to their positive assessment of the

token as an investment opportunity. That explanation tracks the company's

public documents and Kane's statements in the Telegram forum. Based on these

similarities, the jury could reasonably infer that these statements percolated out

to the investors and, in turn, influenced their purchases.

31

Finally, Hampton notes (Br.40) that one investor "admitted that he purchased HYDRO on speculation because other crypto tokens were doing well." *See* DE.277:188 (Berke: "All coins in general were appreciating in value pretty quickly at that period.") "[W]hile the 'solely on the efforts of the promoter or a third party' prong of the *Howey* test may not be met where an investment relies predominantly on market speculation, that is not the case here." *S.E.C. v. Mut. Benefits Corp.*, 408 F.3d 737, 744 (11th Cir. 2005). As just catalogued, the investors' expectations of future returns relied significantly and specifically on Hydrogen's plans to develop the Hydro token.

**B.    Hampton's reliance on *Ripple Labs* is misplaced.**

The district court in *S.E.C. v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 330 (S.D.N.Y. 2023), examined the circumstances associated with a company's sales of its XRP tokens to the public on cryptocurrency exchanges and held on summary judgment that the tokens were not investment contracts under *Howey*. Hampton's effort to analogize the record here to *Ripple Labs* lacks merit.

1.    Hampton cites (Br.41-42) *Ripple Labs*'s observation that "a speculative motive on the part of the purchaser or seller does not evidence the existence of an 'investment contract.'" 682 F. Supp. 3d at 329 (internal quotation marks and citation omitted). This Court has made the same observation. *See Mut. Benefits Corp.*, 408 F.3d at 744 (no investment contract

32

where "investment relies predominantly on market speculation"). But the record here includes (pp.27-29) evidence that the scheme marketed, and that the investors purchased, Hydro tokens based on representations and development plans regarding Hydrogen's platform, the token's utility, and its growth. The jury could thus fairly conclude that investors purchased the tokens "with an expectation of profit … derive[d] … from [Hydrogen's] efforts (as opposed to other factors, such as general cryptocurrency market trends)." *Ripple Labs*, 682 F. Supp. 3d at 329.

2.     Hampton further cites (Br.42) *Ripple Labs*'s observation that the company's sales of its XRP token "were blind bid/ask transactions" and that "[b]uyers could not have known if their payments of money went to [the company], or any other seller of XRP." 682 F. Supp. 3d at 328. But the court later clarified that this feature had not dictated its holding. *See S.E.C. v. Ripple Labs, Inc.*, 697 F. Supp. 3d 126, 136 (S.D.N.Y. 2023) (explaining that its summary judgment order "did not turn on the fact that Programmatic Sales were 'sold through secondary market transactions to retail investors'").

As explained (p.31), the expectation-of-profits prong does not turn on whether an investor purchased the token from the company directly or on the secondary market. The relevant question is whether "an objective investor in both the primary and secondary markets would perceive the[] statements as

promising the possibility of profits solely derived from the efforts of others."
*Coinbase,* 726 F. Supp. 3d at 292; *see also Ripple Labs*, 697 F. Supp. 3d at 136
(clarifying that summary judgment was granted because "an objective,
reasonable … [b]uyer was not led to expect profits from the efforts of Ripple").
The jury in this case could reasonably draw the requisite inference based on
Hydrogen's and Kane's public statements.[8]  *See* pp.27-29, *supra*.

    3.    Hampton notes (Br.42) that "the purchasers of XRP on exchanges
did not make those purchases based on contracts with the crypto company."  As
explained (p.30-31), the expectation-of-profits prong does not turn on whether
the tokens were sold pursuant to a contract.  Indeed, the court in *Ripple
Labs* rejected the defendant's "essential ingredients" test requiring a contract and
post-sale obligations between promoter and investor.  *See* 682 F. Supp. 3d at 322
(explaining that *Howey* and its progeny "make clear that the relevant test reflects
a focus on an investor's expectation of 'profits from the efforts of others,' rather
than the formal imposition of post-sale obligations on the promoter or the grant
to an investor of a right to share in profits") (alteration omitted).

---

[8] Hampton cites (Br.43) *Ripple Labs* in again asserting "no evidence that
the purchaser's speculation was in any way reasonable."  As explained, the jury
could find that an objective investor would have reasonably perceived
Hydrogen's and Kane's public statements and actions as promising the
possibility of returns associated with Hydro's development.  *See* pp.27-29, *supra*.

4. Hampton stresses (Br.42) that "there was no evidence that the crypto company [in *Ripple Labs*] provided its promotional materials to the general public." The evidence in this case, by contrast, shows that Hydrogen and Kane released development reports and public statements about the Hydro token's capabilities and growth. *See* pp.27-29, *supra*.

**C. Hampton's vagueness attack on the securities fraud statute is forfeited and without merit.**

Hampton lastly contends (Br.43-46) that the term "investment contract" in the securities-fraud statute is void for vagueness. His pretrial, mid-trial, and post-trial motions did not raise this claim. DE.57, DE.152, DE.281:125-126. It is accordingly forfeited, and this Court's review is restricted to plain error.

1. A criminal statute is impermissibly vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *id*. at 306, or because reasonable jurists might disagree about where to draw the line between lawful and unlawful conduct in particular circumstances, *see Skilling v. United States*, 561 U.S. 358, 403 (2010).

Hampton asserts (Br.44) that *Howey*'s definition of investment contract encourages arbitrary and discriminatory enforcement. But this Court has repeatedly consulted the definition in criminal and civil cases, including, notably, in an appeal involving the sale of cryptographic tokens associated with a movie-streaming platform. *See Fedance*, 1 F.4th at 1287-1289. The Court's decisions show no difficulty applying *Howey*, and Hampton fails to identify a single decision where (in his view) *Howey*'s application produced an arbitrary or incorrect result.

Indeed, this Court in *Wetherald* rejected a vagueness challenge in a securities-fraud prosecution relating to the defendants' sale of partnership interests in a telecommunications venture because it was "not a case in which it is impossible or even difficult to classify the partnership interests involved." 636 F.3d at 1327. The same is true here. Because it is not impossible or even difficult to apply the *Howey* factors to the sales of Hydro tokens, this constitutional challenge fails.

In response, Hampton notes the Third Circuit's remark about the "uncertainty that pervades litigation over the inherently vague term 'investment contract.'" *Ruefenacht v. O'Halloran*, 737 F.2d 320, 324 (3d Cir. 1984). That stray comment does not demonstrate a constitutional vagueness defect, as confirmed

36

by the Third Circuit's continued application of *Howey* in subsequent years. *See, e.g.*, *S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 186-187 (3d Cir. 2000).

Finally, to the extent Hampton's constitutional claim targets *Howey* rather than the statute itself, he needs to advance it to the Supreme Court. *See* Br.46 (arguing that prior decisions "did not consider whether *Howey*'s test renders § 78i void for vagueness"). This Court is bound to follow *Howey*'s interpretation of the statutory language until the Supreme Court instructs otherwise. *See United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) ("[W]hen a precedent of the Supreme Court has direct application, we must follow it.") (internal quotation marks, brackets, and citation omitted).

2.    Hampton's claim independently fails the second step of plain-error review because he has not demonstrated a clear or obvious vagueness defect in the statutory definition of "investment contract." He acknowledges (Br.45) that this Court and every other appellate court to confront a vagueness claim has rejected it. This landscape forecloses Hampton's challenge. *See, e.g.*, *United States v. Graham*, 123 F.4th 1197, 1274 (11th Cir. 2024) ("[W]e hold that [the defendant] cannot show that the alleged error was 'plain' because there is no Eleventh Circuit precedent on point and because the weight of authority in other circuits is adverse to him."); *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005) ("When neither the Supreme Court nor this Court has resolved an

37

issue, and other circuits are split on it, there can be no plain error in regard to that issue.").

## II. Ample evidence supports the jury's finding that Hampton knowingly agreed to participate in the market-manipulation tactics.

Hampton filed a post-verdict motion for a judgment of acquittal, alleging insufficient evidence showing his knowledge of the illegal purpose underpinning the securities-fraud and wire-fraud conspiracies. DE.152:35-36. The district court denied relief, finding that "the Government sufficiently provided relevant details and information from which a jury could conclude that [Hampton] had knowledge of the conspiracy and actively participated in both wash and spoof trading." DE.181:8. Hampton appeals (Br.48-50) this ruling, but his claim fails.

### A. The evidence supportably demonstrates that Hampton hired Moonwalkers to engage in manipulative trading tactics.

"It is fundamental that the issue of criminal intent is usually a question of fact for the jury to decide." *United States v. Crumbley*, 745 F.2d 1348, 1350 n.3 (11th Cir. 1984) (citation omitted). "It is seldom susceptible of proof by direct evidence and in most cases must be proved by inference from the facts and circumstances of the particular case." *Ibid.* The evidence here readily supports the inference that Hampton—in arranging Hydrogen's contract with Moonwalkers—knowingly agreed to engage in manipulative trading tactics.

38

In a phone call with Ostern, Hampton confirmed his interest in having Moonwalkers sell the Hydro tokens held by Hydrogen in a manner that would not hurt the price. DE.278:53. During this call, Ostern described the trading tactics employed by the Moonwalkers bot to Hampton. *Id.* at 54-55, 80. Kane, Hampton, and Chorlian then conferred about the decision to retain Moonwalkers. Hampton explained that "we need to distinguish between market making and getting liquidity" and "we can tell them that liquidating the HYDRO is the priority." DE.138-6:1. Hampton further reported: "I do think their bot is the best." *Id.* at 2. Kane said the decision was "[r]eally up to" Hampton, *ibid.*, who signed the contract with Moonwalkers, DE.278:94-95.

A reasonable jury, viewing this evidence in a light most favorable to the government, could conclude that Hampton understood the bot's manipulative trading features and retained Moonwalkers precisely because those features would help Hydrogen sell its Hydro tokens. That sequence reflects Hampton's knowing agreement to engage in deceptive trading tactics.

Hampton's rejoinders lack merit. He asserts (Br.47) a lack of "direct evidence from anyone … that they explicitly told [him] about the bot's illegal usage." The jury, however, was free to credit Ostern's testimony that he described the bot's features to Hampton.

39

On that point, Hampton asserts (Br.48) that Ostern "could not keep a straight story on whether he informed Hampton about the Moonwalker's bot." Defense counsel raised this point to the district court, which discerned no inconsistencies in Ostern's testimony. *See* DE.278:70 ("I don't see that he is testifying as clearly inconsistently with the statements that he's made."). In any event, the court invited counsel to "impeach him … on cross-examination," *ibid.*, and the jury had the final say on whether to credit Ostern's testimony. *See United States v. Downs*, 61 F.4th 1306, 1316 (11th Cir. 2023) ("Credibility questions are the exclusive province of the jury, and on sufficiency review we must assume that they were answered in a manner that supports the verdict unless witness testimony is 'unbelievable' as a matter of law.") (citations omitted).

Hampton further notes (Br.47) that "[t]he agreement that Hampton signed mentions no illegal services." But "[t]he jury had sufficient evidence, viewed in the light most favorable to the verdict, to conclude that the written … agreement was nothing but a smokescreen to hide … conspiratorial conduct." *United States v. Clough*, 978 F.3d 810, 819 (1st Cir. 2020). In particular, the jury heard testimony that Ostern and Hampton used certain contract language "to avoid regulatory scrutiny" and "[t]o try not to be caught." DE.278:83.

40

**B.    The evidence supportably shows that Hampton also guided Moonwalkers' manipulative trading tactics.**

Communications over the Slack channel confirm Hampton's agreement to engage in deceptive trading tactics.

For instance, Ostern sought input on a plan to "in[cite] a firesale [of tokens] to shake the weak hands, and get the sell walls to move down a bit so we gain position [and] then push [the] price hard." DE.137-1:10. Kane responded that "[Hampton] is owning this going forward," and Hampton proposed to "chat tomorrow." *Ibid.* Weeks later, Ostern advised that some "people [had] put[] up big sell walls" and proposed three options to increase Hydro's market price: (1) build trust in the token over the Hydro trade chat; (2) "nuke" the sell orders; or (3) "spend a little in transaction fees and pump volume again for some attention." *Id.* at 15. Hampton approved the third option. *Ibid.*

A reasonable jury, viewing these messages in a light most favorable to the government, could conclude that Hampton monitored and guided Moonwalkers' manipulative trading tactics. This proof amply supports the finding that Hampton knowingly joined the charged conspiracies.

Hampton dismisses (Br.48) the messages on the ground that "[he] was busy with other obligations, which counsels against any finding that he must

41

have read and understood every phrase or word written in the Slack channe[l]." The jury was free to reject that inference. The Slack channel shows that Hampton regularly engaged in these conversations. DE.137-1. Kane also specifically announced that "[Hampton] is owning this going forward." *Id*. at 10. A reasonable jury would interpret Kane's statement as an advisement that Hampton would supervise Moonwalkers' trading activities.[9]

Hampton also asserts (Br.48) "little to no proof that [he] read th[e] phrases [on the Slack channel], was aware of what was being written, or knew that the terms meant something illegal." Again, the jury was free to reject this inference. Hampton had the most crypto market and finance expertise at Hydrogen. DE.276:73. And Hampton never voiced confusion during the Slack exchanges. Finally, the jury learned that Hampton had suggested wash trading of the Hydro token one month before he retained Moonwalkers. The conspirators—Kane, Hampton, and Chorlian—disagreed with the token valuation reported by the Coin Market website and "talk[ed] through different means to get them to change the number." DE.276:152-153. Hampton proposed that "we could sell our tokens and/or sell them to each other" to depict an increased token supply. DE.138-5:3. That Hampton had previously urged wash trading makes it likely

---

[9] That "Hampton lacked direct access to the Hydrogen Technology account" is insignificant for the same reason. Br.47. Moonwalkers traded from that account, and Hampton supervised Moonwalkers.

that he understood various co-conspirator references to "volume shenanigans" and "pump[ing] the volume again for some attention." DE.137-1:13, 15.

"[A] jury is free to choose among reasonable constructions of the evidence." *United States v. Foster*, 878 F.3d 1297, 1304 (11th Cir. 2018) (internal quotation marks and citation omitted). And the jury here permissibly rejected the defense theories (which Hampton's counsel argued in closing, DE.281:73, 79-80) and found Hampton's knowing agreement to engage in market manipulation.

## III. The district court appropriately exercised its discretion when excluding Hampton's cryptocurrency expert.

Federal Rule of Evidence 702 assigns to the district court "the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993). "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (internal quotation marks, emphasis, and citation omitted). It specifically directs the court to consider whether "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his

43

conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Ibid.* (citation omitted).

Hampton provided notice of his intent to call an expert to testify that a reasonable person could not know whether Hydro tokens were a security in 2018. DE.95-1. The expert based his conclusion on his review of Hydrogen's public statements regarding the Hydro token and the regulatory landscape for cryptocurrency at the time. *Ibid.* Before trial, the government moved under Rule 702 to exclude the expert's opinion. DE.95.

The district court granted this motion. DE.107. The court held that "a hypothetical reasonable person's ability to know whether HYDRO constituted a security at the time of the alleged conspiracy is not relevant to the charged offenses." *Id.* at 5. It therefore held that "expert testimony on what a reasonable person may believe would not assist the jury in deciding the disputed issues." *Id.* at 6. The court relatedly held that the expert's "recitation of the regulatory history of cryptocurrencies generally … is not relevant" and fails to "appl[y] any scientific, technical, or specialized expertise." *Id.* at 7.

Hampton appeals (Br.52-53), but he fails to show that the district court's ruling was "manifestly erroneous." *Frazier*, 387 F.3d at 1258.

44

Hampton cursorily states (Br.52) that "[t]he expert applied his expertise in reaching his conclusion." Hampton fails, however, to meaningfully contest the district court's ruling that the expert failed to apply any scientific, technical, or specialized expertise in reaching his conclusions. DE.107:7. Hampton's claim therefore fails *Daubert*'s methodology prong.

The claim fares no better at *Daubert*'s assist-the-trier-of-fact prong. Hampton contends (Br.52) that the expert "would have provided context to the jury in making its decision of whether HYDRO was a security." But the district court noted that the expert's report "largely appear[ed] to mirror the public statements of Hydrogen and its employees and financial regulators." DE.107:7. It further reasoned that "[j]urors can understand these public statements without an expert's aid." *Ibid*. Hampton has not shown an abuse of discretion in the conclusion that these materials fell within the average juror's competence.

Hampton alternatively argues (Br.52) that the expert "would have provided a relevant explanation for Hampton's state of mind when hiring Moonwalkers." This contention fails because, as the district court correctly explained, the charged offenses do not turn on whether Hampton understood that Hydro was a security in 2018. DE.107:5; *see also United States v. Tucker*, 345 F.3d 320, 330 (5th Cir. 2003) ("[T]he defendant's belief concerning the nature of the securities is irrelevant."); *United States v. Brown*, 578 F.2d 1280, 1284 (9th

45

Cir. 1978) ("[T]he government is required to prove specific intent only as it relates to the action constituting the fraudulent, misleading or deceitful conduct, but not as to the knowledge that the instrument used is a security under the Securities Act.").

Even if error occurred, it was harmless. The jury heard considerable testimony regarding Hydrogen's decision to create the Hydro token; Hampton fails to identify any specific contextual information that the jury lacked. The record also lacks any foundation connecting the proffered regulatory uncertainty to Hampton's own state of mind in 2018. "[T]he proffered evidence is irrelevant absent evidence that [Hampton] actually relied on this information" when he hired and engaged with Moonwalkers. *United States v. Dynalectric Co.*, 859 F.2d 1559, 1574 n.19 (11th Cir. 1988); *United States v. Curtis,* 782 F.2d 593, 599 (6th Cir. 1986) ("Unless there is a connection between the external facts and the defendant's state of mind, the evidence of the external facts is not relevant."). Given these circumstances, the exclusion of the defense expert had no substantial influence on the trial's outcome. *See United States v. Barton*, 909 F.3d 1323, 1337 (11th Cir. 2018) (harmless-error standard).

**IV.    The district court appropriately exercised its discretion when excluding evidence that Hampton learned that legal counsel had approved a decentralization plan and a market maker.**

Before trial, Hampton moved to admit evidence that he learned that legal counsel had approved a decentralization plan and the hiring of a market maker for the Hydro tokens.  DE.75:10.  The decentralization plan entailed Hydrogen's free distribution of tokens to developers who would promote the token, DE.276:57, DE.277:40, and a market maker is a third party that actively buys and sells tokens with other parties to facilitate liquidity, DE.276:84; *see also Orkin v. S.E.C.*, 31 F.3d 1056, 1059 n.3 (11th Cir. 1994) ("A market maker includes any dealer who, with respect to a security, buys from and sells to other dealers."). Hampton argued that his awareness of counsel's approval demonstrated his lack of intent to defraud.[10]  DE.75:11-12.

The district court denied the motion.  It observed that "[t]he alleged illegal conduct is the wash trading and spoof ordering which allegedly artificially inflated HYDRO's price."  DE.90:10.  "Because the legality of market makers and Hydrogen's decentralization plan … is uncontested," the court held that "this derivative advice of counsel statement … would not be probative to negate

---

[10] Hampton stressed that he was not offering an advice-of-counsel defense. DE.75:11.

an intent to defraud and would confuse and distract the jury with irrelevant evidence." *Ibid.* No abuse of discretion occurred in this ruling.

In response, Hampton contends (Br.53) that this evidence is probative of his state of mind: "defendants in a conspiracy do not generally believe that their actions have been approved by the legal department." As the district court explained, however, the charged offense conduct did not implicate the decentralization plan or the hiring of a market maker. The grand jury had instead alleged Hampton conspired to engage in a specific fraud scheme that involved wash trading and spoof ordering of the Hydro token. A good-faith belief in the legality of distributing free tokens or hiring a firm to facilitate token trading on the market has no bearing on Hampton's intent to engage in wash trades and spoof orders—activities that generate *fake* token trades and orders. The district court thus permissibly classified evidence relating to counsel's approval of the decentralization plan and market-maker hiring as irrelevant and distracting.

Hampton further contends (Br.53) that his proffered evidence would have helped the jury decipher the Slack messages. He never proffered this relevance theory to the district court, DE.75:10-12, and he further fails to identify any message in the 57-page Slack exhibit implicated by this excluded evidence. Appellate review is accordingly foreclosed due to inadequate briefing. *See*

*Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682 (11th Cir. 2014) (appellants abandoned arguments after making only "passing references" in the opening brief).  At a minimum, this Court's review is restricted to plain error and Hampton's cursory briefing falls far short of that standard.  *See United States v. Dennis*, 786 F.2d 1029, 1042 (11th Cir. 1986) (reviewing for plain error where "no defendant objected to the testimony at trial on the grounds they now urge on appeal").

Finally, the exclusion of this evidence, if error, was harmless considering the trial evidence showing that Hampton himself distinguished the decentralization plan and market-making activities and the deceptive activities (wash trading and spoof ordering) underpinning the charged conspiracies.

- The decentralization plan contemplated Hydrogen's free distribution of the Hydro token to developers who would promote the token. DE.276:57, DE.277:40.  The Slack messages, in contrast, show that Hampton intended for Moonwalkers to sell these tokens.  *See, e.g.*, DE.137-1:23 (Hampton "We still have a large chuck of total token supply to offload … a few billion tokens.").

- Market making involves a third party's efforts to buy and sell tokens without changing that party's overall market position.  DE.276:84. Hampton's messages, in contrast, show that he wanted Moonwalkers

49

to actively sell Hydrogen's tokens and decrease the company's position. *See ibid.* (Hampton: "We need to distinguish between market making and getting liquidity. … We can tell them that liquidating the HYDRO is the priority.").

No reasonable jury would have accordingly assigned significance to a legal opinion approving the decentralization plan or the hiring of a market maker, or to evidence showing Hampton's knowledge of the opinion.

## V.     No instructional error occurred.

Hampton asserts (Br.48-51) instructional errors pertaining to the district court's definition of "securities" and its refusal to give a mistake-of-fact instruction.  Each claim fails.

### A.     The district court correctly defined the term "securities."

With respect to the Count One securities-fraud conspiracy, the district court instructed the jury to determine whether the Hydro tokens were investment contracts and, therefore, a "security" under federal law. DE.280:166.  The court defined an investment contract as "an investment of money," "in a common enterprise," "with the expectation of profits to be derived solely from the entrepreneurial or managerial efforts of Hydrogen and other HYDRO promotors."  DE.280:166-167.  As relevant here, the court

50

explained that a common enterprise means "the individual buyer depended upon the efforts of Hydrogen for their returns: i.e., profits."  DE.280:167.

On appeal, Hampton objects (Br.51) that the district court failed to define "common enterprise" using specific language from *S.E.C. v. Unique Fin. Concepts, Inc.*  There, this Court stated that "a common enterprise exists where the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties."  196 F.3d at 1199 (internal quotation marks and citation omitted).  The district court's language, however, mirrored a more recent opinion, *S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005).  There, this Court explained that the common-enterprise test requires a showing that "'the investors are dependent upon the expertise or efforts of the investment promoter for their returns.'"  *Id.* at 732 (citation omitted); *see also Eberhardt*, 901 F.2d at 1582 (asking whether "the investor expect[s] profits solely from the efforts of others").  Because the district court's definition was a correct statement of the law, tracked *ETS Payphones*, and is functionally equivalent to Hampton's desired wording, no abuse of discretion occurred.

Hampton further objects (Br.51) that the district court's language "appears subjective," but that concern lacks merit.  The court's instruction correctly tasked the jury with deciding whether investors had an active or passive role in the Hydro token's success.  That is precisely what this Court's decisions demand.

51

*See Eberhardt*, 901 F.2d at 1580-1581 ("The thrust of the common enterprise test is that the investors have no desire to perform the chores necessary for a return, and are attracted to the investment solely by the prospects of a return."); *ETS Payphones*, 408 F.3d at 732 (test satisfied where "[i]nvestors were dependent upon [the promoter's] ability to attract new business to realize profits").

Finally, any instructional error was harmless beyond a reasonable doubt. *See United States v. Ruan*, 56 F.4th 1291, 1298 (11th Cir. 2023) (harmlessness standard for instructions on elements). As catalogued (pp.25-32), the jury heard overwhelming evidence that individuals who purchased Hydro tokens on the Bittrex exchange had no role in developing token-related applications or promoting token use by other companies. Investors were instead "led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 299.

### B. The district court appropriately exercised its discretion in refusing a mistake-of-fact instruction due to inadequate foundation.

"[A] defendant's 'mistake of fact' may negate criminal intent, if believed by a jury properly instructed on the law, where the defendant did in fact engage in the conduct giving rise to the charged offense." *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995). A defendant is entitled to this theory-of-defense

52

instruction if "some evidence [is] adduced at trial relevant to that defense." *Ibid.*
"The threshold burden is extremely low." *Ibid.*

Hampton requested a mistake-of-fact instruction, asserting "ample evidence in the record that [he] was searching for a legitimate market maker and believed Moonwalkers to be a legitimate market maker." DE.280:154. The district court denied the instruction, finding that Hampton failed to meet his burden of production: "I don't have even the bare minimum to get it to that." *Id.* at 156. The court also stated that "the rest of the instructions adequately cover the issue that the burden is on the Government to prove that [Hampton] had the intent to knowingly and willfully engage in criminal activity." *Ibid.*

This ruling did not reflect an insistence that Hampton himself testify (Br.33), but was instead an appropriate exercise of discretion. The court asked counsel to identify "some evidence … that [Hampton] was mistaken … in the way that [Moonwalkers] was operated." DE.280:154. When counsel offered nothing, *ibid.*, the court permissibly refused this theory-of-defense instruction. *See generally United States v. Zayyad*, 741 F.3d 452, 460 (4th Cir. 2014) ("If the defendant wants to present a theory or belief that might have justified his actions, then he must present evidence that he in fact relied on that theory or belief.").

Hampton's appellate presentation is similarly spare. He contends (Br.50) that he was "entitled to argue inferences from the admitted evidence that [he]

mistakenly believed there was no illegal conspiracy," but fails to cite any trial testimony, documentary evidence, or Slack channel exchange intimating *his subjective belief* that Moonwalkers performed legitimate market-making activities for Hydrogen.[11]

Hampton's reliance on *Ruiz* is likewise misplaced. There, the defendant testified that she mistakenly believed that she was assisting the government by aiding a drug dealer whom she thought was a government informant. 59 F.3d at 1153. This Court held that the defendant's testimony "met the evidentiary burden." *Id.* at 1154. Here, in contrast, Hampton failed to cite any evidence below illustrating his subjective belief.

Even if the district court mistakenly denied the instruction, reversal is unwarranted because the remaining instructions "substantially cover[ed] the proposed instruction" and "the denial [did not] substantially impair[] [Hampton's] ability to present an effective defense." *United States v. Vereen*, 920 F.3d 1300, 1306 (11th Cir. 2019). The court instructed that the jury could find Hampton guilty of securities-fraud conspiracy "only if … two or more persons in some way agreed to try to accomplish a shared and unlawful plan to

---

[11] Hampton also suggests (Br.50) that he might have mistaken the meaning of a term or phrase used in the Slack channel, but he failed to reference this evidence below. On appeal, he fails to identify any term or phrase in the Slack channel evidencing his subjective belief in Moonwalkers' legitimacy.

manipulate security prices by wash trading or spoof trading" and Hampton "knew the unlawful purpose of the plan and willfully joined in it." DE.280:164. The court provided a similar instruction for wire-fraud conspiracy: the jury had to find that Hampton "knew the unlawful purpose of the plan and willfully joined in it." *Id.* at 168-169. These instructions allowed Hampton to argue his mistake-of-fact defense at closing—and he did so. *See* DE.281:50 (arguing that it "is not enough if he had good faith to believe that what he was doing was legitimate and was part of a legitimate plan, because that is what was on his mind"); *id.* at 52 ("That is the legitimate plan that was on [Hampton's] mind.); *id.* at 80 ("Hampton is… thinking that he is executing a legal decentralization plan for a token that he believes in with a market maker that is doing legal things.").

All told, Hampton freely argued at closing that he lacked knowledge of Moonwalkers' manipulative trading tactics and instead believed that the firm would provide legitimate services. If the jury credited this defense, the district court's instructions required it to acquit because Hampton would have lacked knowledge of the conspiracy's unlawful purpose. Because the instructions covered Hampton's defense and allowed him to argue his subjective belief in Moonwalkers' legitimacy to the jury, no reversible error occurred.

55

## VI.    No cumulative error occurred.

Hampton briefly references (Br.52) the cumulative-error doctrine, which "provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation marks and citation omitted).  This invocation fails because the district court made no evidentiary or instructional errors.  Moreover, "overwhelming evidence supports the jury's verdict such that any errors had no 'substantial influence' on the verdict." *United States v. Green*, 981 F.3d 945, 959 (11th Cir. 2020).

## VII.   The district court correctly calculated the Sentencing Guidelines range.

The district court calculated a Guidelines range of 37-46 months based on an offense level of 21 and a criminal history category of I.  DE.270:22.  Hampton assigns two errors (Br.55-59) to this calculation.  These claims fail.

### A.    The district court made a reasonable estimate of gain.

Guidelines § 2B1.1(b)(1) establishes the defendant's offense level based on the loss associated with his conduct.  The Commentary defines "loss" as the greater of "actual" loss or "intended" loss.  U.S.S.G. § 2B1.1 cmt. n.3(A) (2023).  "[T]he district court need only reach a reasonable estimate of loss," and its finding "is entitled to appropriate deference." *United States v. Melgen*, 967 F.3d

1250, 1265 (11th Cir. 2020). The Commentary further states that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."[12] U.S.S.G. § 2B1.1 cmt. n.3(B).

1.    The government argued that the loss connected to Hampton's offense conduct could not reasonably be determined. DE.187:6. It cited Bittrex trading data showing that over 5,500 individuals lost $3.6 million buying and selling Hydro tokens on the exchange during the period in which the Moonwalkers bot operated. *Id*. at 4-5. The government also flagged the bot's operation in placing thousands of anonymous trades per minute; alternating between wash trades, spoof orders, and other manipulative tactics; manipulating the price either upwards or downwards; and buying tokens at lower prices and reselling them at higher prices following further manipulation. *Id*. at 9. Given these features, the government argued that "it is difficult if not impossible to determine the exact amount of loss that is attributable to the scheme and that which is attributable to other market factors." *Ibid*. It further noted the bot's tactics on Bittrex influenced Hydro token sales by countless investors on other exchanges at the same time. *Id*. at 10.

---

[12] Hampton argued below that this Commentary was invalid but concedes on appeal (Br.56 n.10) that *United States v. Horn*, 129 F.4th 1275 (11th Cir. 2025), forecloses the claim.

57

The government highlighted other market-manipulation cases where courts had used gain as a proxy for the loss. *Id.* at 9; *see, e.g.*, *United States v. Coscia*, 866 F.3d 782, 801 (7th Cir. 2017) ("The nature of [the defendant's] trading made determining the when, where, and with whom of his transactions almost impossible; using his programs, he executed thousands of trades over a ten-week period with innumerable counterparties."); *United States v. Parris*, 573 F. Supp. 2d 744, 748 (E.D.N.Y. 2008) ("[T]he difficulties inherent in calculating loss to the market in this case made [the gain's] use appropriate.").

The government then sought to hold Hampton responsible for a gain between $1.5-3.5 million, resulting in a 16-level enhancement under Guidelines § 2B1.1(b)(1)(I).  DE.187:6.  This represented Hydrogen's profits from selling its Hydro tokens during the conspiracy.  *See* DE.279:172-173 (trial testimony).

For his part, Hampton urged loss as the appropriate measure and proposed a loss amount no greater than $33,753.  DE.190:11.  He relied on a defense expert who examined the Bittrex trading data and identified this figure as the maximum potential loss caused by the fraudulent trading tactics.  *Id.* at 11-12.

2.    At sentencing, the district court calculated a $1.3-million gain. DE.270:12.  It observed that other judges in the district had used this gain calculation for Hampton's co-conspirators, including the judge at Kane's

58

sentencing. *Ibid.*; *see* DE.290:128 (Williams, J.) (finding that "$1.3 million went into the bank account of Hydrogen as a result of sales in the relevant time period … when the bots were operative").[13]

The government announced that, "based on the ruling of Judge Williams, the Government is going to agree that 1.3 [million] is the correct figure for gain." DE.270:13. Defense counsel then stated that Hampton was "not challenging the 1.3 [million] number for gain," but argued that actual loss was still the appropriate measure. *Id.* at 16. Counsel urged a $47,764 loss, reflecting the losses incurred by the two victims who testified at trial. *Id.* at 15.

The district court overruled Hampton's objection. It cited "the difficulty of determining the loss in this particular case" and found "that gain would be the appropriate" measure. *Id.* at 17-18. The court also rejected the loss methodology and analysis offered by Hampton's expert. *Ibid.* Finally, the court believed that a gain calculation "inure[d] to [Hampton's] benefit." *Id.* at 18. The court accordingly imposed a 14-level enhancement under Guidelines § 2B1.1(b)(1)(H). PSR ¶ 63.

---

[13] Testimony at Kane's sentencing explained that Hydrogen sold its Hydro tokens for $1.5-million worth of bitcoin. Hydrogen subsequently exchanged the bitcoin into U.S. dollars, which, due to fluctuations in the conversion rate, resulted in $1.3-million cash. DE.290:81-82.

3.     Hampton challenges the district court's gain calculation on three grounds. All fail.

First, Hampton contends (Br.56) that the district court summarily selected gain as the appropriate measure because it resulted in a more conservative calculation compared to actual loss. That is wrong. The district court expressly cited "the difficulty of determining the loss in this particular case." DE.270:17. It thus made the requisite determination under Guidelines § 2B1.1 cmt. n.3(B).

Second, Hampton contends (Br.56) that the government failed to explain why it could not calculate loss. To the contrary, the government's sentencing memorandum explained in detail why actual loss could not be reasonably determined in this market-manipulation case. DE.187:6-13. The district court also reviewed Kane's day-long sentencing hearing where Judge Williams reached the same conclusion with respect to the same offense conduct. The court thus had ample foundation to use gain as the Guidelines § 2B1.1 measure.

Third, Hampton contends (Br.56-57) that the $1.3-million gain calculation was speculative. His counsel, however, expressly declined to challenge the factual basis supporting this gain calculation. *See* DE.270:14 ("I'm not objecting to the 1.3 number being the appropriate gain amount."); *id.* at 16 ("[W]e are not challenging the 1.3 number for gain."). The demanding plain-error standard therefore forecloses relief. The government adduced testimony at trial showing

60

that Hydrogen gained $1.5 million in bitcoin during the conspiracy period and subsequently exchanged it for $1.3 million in U.S. dollars.  DE.279:172-173.  The record at Kane's sentencing identified the same figures.  *See* p.59 n.13, *supra*.  The district court, as factfinder, permissibly credited this evidence.  No clear error, much less plain error, occurred.  *See United States v. Maxwell*, 579 F.3d 1282, 1307 (11th Cir. 2009) (reviewing district court's gain calculation for clear error).

### B.      The district court did not plainly err in applying the sophisticated-means enhancement.

Guidelines § 2B1.1(b)(10) authorizes a two-level enhancement where "the offense … involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." The Probation Office recommended this enhancement.  PSR ¶ 64.  Hampton did not object, and the district court applied it.  DE.270:19

On appeal, Hampton disputes (Br.58) his personal connection to any sophisticated conduct: "He did not manage Moonwalkers' bot, and he did not have access to Hydrogen Technology's Bittrex account."  Hampton then seeks relief under the plain-error standard.  His claim lacks merit.

"A district court's finding that sophisticated means were used is a finding of fact reviewed for clear error," *United States v. Barrington*, 648 F.3d 1178, 1199

(11th Cir. 2011), and Hampton fails that standard here. The trial record shows that Hampton intentionally engaged in or caused the market manipulation tactics employed by Moonwalkers. As recounted above, the evidence well supports findings that Hampton understood the bot's manipulative trading features, sought to retain Moonwalkers precisely because those features would help Hydrogen sell its Hydro tokens, and subsequently monitored and guided Moonwalkers' manipulative trading tactics. *See* pp.38-43, *supra*.

Because the district court's finding has ample evidentiary support, Hampton has not shown clear error (much less plain error) warranting relief.

## CONCLUSION

The Court should affirm.

Respectfully submitted,

MATTHEW R. GALEOTTI
Head of the Criminal Division

ANDREW JACO
Trial Attorney, Fraud Section

/s/ David M. Lieberman
DAVID M. LIEBERMAN
Attorney, Appellate Section
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 262-6805
david.lieberman@usdoj.gov

62

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,869 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared on a proportionally spaced typeface using Microsoft Office 365 in 14-point Calisto MT font.

/s/David M. Lieberman